1

2

3

4                        UNITED STATES DISTRICT COURT

5                      NORTHERN DISTRICT OF CALIFORNIA

6

7    VICIOUS BRANDS, INC.,                    Case No.  24-cv-04996-LJC

8                 Plaintiff,

9         v.                                  **ORDER REGARDING MOTION TO
                                              DISMISS SECOND AMENDED
10   FACE CO., LLC, et al.,                   COMPLAINT AND MOTION FOR
                                              SUMMARY JUDGMENT**
11               Defendants.
                                              Re: Dkt. Nos. 64, 67

12

13   **I.    INTRODUCTION**

14         Plaintiff Vicious Brands, Inc., doing business as Saints & Sinners, brings this action

15   against Defendants Face Co., LLC, Skin Saint, LLC, and Holly Cutler, alleging that Defendants

16   infringed Plaintiff's trademark and falsely advertised Defendants' skincare products.  The Court

17   previously denied Defendants' motion to dismiss the case for lack of personal jurisdiction and

18   improper venue, or in the alternative, to transfer the case to the Eastern District of Michigan, ECF

19   No. 25, denied Defendants' motion to stay the case pending the resolution of administrative

20   proceedings before the Trademark Trial and Appeal Board, ECF No. 40, and granted in part and

21   denied in part Defendants' motion to dismiss Plaintiff's first amended complaint, ECF No. 60. [1]

22         Defendants move once again to dismiss Plaintiff's false advertising claim.  ECF No. 64.

23   Defendants also move for summary judgment on Plaintiff's trademark claims.  ECF No. 67.  Both

24   motions raise some of the same arguments as Defendants' previous motion to dismiss the First

25

26   _____

[1] *Vicious Brands, Inc. v. Face Co., LLC*, No. 24-cv-04996-LJC, 2024 WL 4753287 (N.D. Cal.
27   Nov. 12, 2024); *Vicious Brands, Inc. v. Face Co., LLC*, 2025 WL 754068 (N.D. Cal. Mar. 10,
     2025); *Vicious Brands, Inc. v. Face Co., LLC*, 2025 WL 2198609 (N.D. Cal. July 25, 2025).
28   Citations herein to documents filed in the docket of this case refer to page numbers as assigned by
     the Court's ECF filing system, unless otherwise specified.

Amended Complaint, but the arguments are directed to different allegations and a more fulsome factual record. The Court held a hearing on November 4, 2025. For the reasons discussed below, Defendants' Motion to Dismiss Plaintiff's false advertising claim under the Lanham Act is GRANTED, with leave to amend. Defendants' Motion for Summary Judgment as to Plaintiff's trademark claims is DENIED, except as to the theory of reverse confusion.[2]

## II.    BACKGROUND

### A.    Factual Overview

The following facts are not substantially in dispute (except where specifically characterized as one party's allegations) and provide an overview that is relevant to both pending motions and to the Court's previous Order. More detailed summaries of relevant allegations and evidence are provided in the context of the two present motions addressed below.

Since 2016, Plaintiff has developed and sold haircare products under the Saints & Sinners trade name, using a mark that includes two horizontally conjoined instances of the letter S:



Plaintiff has registered trademarks, issued in 2016, that include that mark. Plaintiff promotes and sells its products throughout the United States and internationally, through channels including celebrity styling events, Amazon Premium Beauty, social media, and various publications and media outlets.

Defendants sell beauty consultation services and skincare products under the Skin Saint trade name, using a mark that consists of two vertically conjoined instances of the letter S:



Defendants created that mark in 2020, began using it in 2021, and applied for registration in 2022,

---

United States District Court
Northern District of California

[2] The parties have consented to the jurisdiction of a magistrate judge for all purposes under 28 U.S.C. § 636(c).

but Plaintiff first learned of it in 2023.  Defendants previously used a different mark that did not involve a double-S logo or otherwise resemble Plaintiff's mark in any way.  Defendants sell their products through a physical location in Michigan and, to a lesser extent, nationally through their website.  The parties dispute the degree to which their websites are aesthetically similar. Defendants have also made at least some sales through the "shop.app" consolidated online sales platform but characterize them as de minimis.  Defendants promote their products through social media and, at least in the past, also promoted them through national television appearances.

Although Plaintiff does not currently sell skincare products—or at least did not at the time it filed its Second Amended Complaint or briefed the present Motions—it asserts that it has been planning to expand into that related field since 2019, and that it has skincare products nearly ready for market.  Plaintiff contends that Defendants falsely advertise the benefits of their products, because (according to Plaintiff) certain claims on Defendants' website are not supported by testing or by the company that Plaintiff believes is Defendants' supplier.

**B.      Previous Order**

The Court previously denied Defendants' motion to dismiss Plaintiff's trademark claims, where Defendants argued that Plaintiff had not sufficiently alleged a likelihood of confusion.  The Court found most of the relevant factors identified in *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 & n.11 (9th Cir. 1979), and subsequent Ninth Circuit decisions to be equivocal in this case.  ECF No. 60 at 6–15.  The "voluminous materials the parties . . . submitted for judicial notice" did not alter that conclusion.  *Id.* at 15.  "[T]he finder of fact's ultimate task will be to weigh and balance competing evidence to predict the likelihood of confusion," and the Court declined "to resolve that 'non-exhaustive, multi-factor, fact-intensive inquiry' based on an artificially constrained universe of whatever evidence the parties manage[d] to shoehorn in through the doctrine of judicial notice."  *Id.* (citation omitted).

The Court granted Defendants' previous motion as to Plaintiff's false advertising claim. Plaintiff provided insufficient allegations of imminent direct competition to establish either constitutional standing under Article III or a cognizable injury under the Lanham Act.  *Id.* at 16– 18.  Plaintiff also failed to provide sufficiently particularized allegations regarding Defendants'

United States District Court
Northern District of California

United States District Court
Northern District of California

purportedly false representations to satisfy the heightened pleading standard of Rule 9(b) of the Federal Rules of Civil Procedure. *Id.* at 18–20. The Court therefore dismissed the false advertising claim with leave to amend. *Id.* at 18, 20.

### C.    Claims Asserted

Plaintiff amended its pleading to include further allegations regarding the false advertising claim. *See* 2d Am. Compl. (SAC, ECF No. 63) ¶¶ 48–85. Plaintiff brings the following claims in its Second Amended Complaint: (1) trademark infringement in violation of 15 U.S.C. § 1114, SAC ¶¶ 105–18; (2) unfair competition and false designation of origin in violation of 15 U.S.C. § 1125(a), SAC ¶¶ 119–32; (3) false advertising in violation of 15 U.S.C. § 1125(a)(1)(B), SAC ¶¶ 133–41; (4) unfair competition in violation of section 17200 of the California Business and Professions Code (the UCL), SAC ¶¶ 142–49; (5) common law trademark infringement, *id.* ¶¶ 150–61; and (6) common law unfair competition, *id.* ¶¶ 162–72. These are the same claims Plaintiff asserted in the First Amended Complaint. *See* ECF No. 60 at 3–4.

## III.    MOTION TO DISMISS FALSE ADVERTISING CLAIM

### A.    Background

Defendants move once again to dismiss Plaintiff's claim for false advertising under the Lanham Act for lack of statutory and constitutional standing. Plaintiff has alleged that "Defendants have engaged in false advertising by making misleading and deceptive claims about their products in commercial advertisements and promotions, including representations that their products are medical grade, provide anti-aging results equivalent to that of medical cosmetic treatments like injectable fillers and toxins, and reverse/prevent aging changes in the skin." SAC ¶ 9. Plaintiff's UCL claim rests on same theory of false advertising. *See* SAC ¶ 147.

At the hearing, neither party disputed that the analysis regarding Article III standing and a cognizable injury under the Lanham Act also applies to Plaintiff's UCL claim to the extent that it is premised on the same alleged misconduct. Defendants have not renewed the arguments in their previous Motion to Dismiss that Plaintiff failed to allege false statements with specificity as required by Rule 9(b). Nor does this Motion seek to dismiss Plaintiff's trademark claims, which are addressed separately in Defendants' Motion for Summary Judgment.

United States District Court
Northern District of California

The Court previously declined to determine how "imminent" an injury must be to satisfy Article III, but held that Plaintiff had not sufficiently alleged direct competition to support the Lanham Act's presumption of commercial injury:

> This Court is not inclined to read *ThermoLife* [*International, LLC v. BPI Sports, LLC*, No. 21-15339, 2022 WL 612669 (9th Cir. Mar. 2, 2022)] as ruling out the possibility that allegations of meaningful product similarities might be sufficient in some cases to support an inference of competition, at least at the pleading stage. But to the extent *ThermoLife* reflects the Ninth Circuit's view of how direct[ly] the parties must compete with one another to establish statutory standing, Plaintiff's allegations here that it intends to produce an unspecified "product offerings in the skincare market," FAC ¶ 35, including an unspecified "first skincare product" that is "formulated and ready for market" (other than "finaliz[ing] the fragrance"), *id.* ¶ 38, fall far short. Beyond that, Plaintiff alleges only that it "will compete directly with Defendants' skincare products" and that "Defendants' false advertising . . . is likely to cause competitive injury to Plaintiff by diverting consumer attention and sales away from Plaintiff's forthcoming skincare products," *id.* ¶¶ 105–06, which are the sort of conclusory assertions the Supreme Court has held insufficient to state a claim. *See Iqbal*, 556 U.S. at 678–79. The Court agrees with Defendants that Plaintiff would need to "allege that it intends to offer skincare products similar to those sold by Defendants," *see* ECF No. 50 at 14, which would likely require alleging *facts* about both Plaintiff's forthcoming skincare product(s) and Defendants' products.

ECF No. 60 at 17–18.

Plaintiff now relies primarily on the following allegations in the Second Amended Complaint to establish imminent direct competition:

> 35. Since at least 2019, Saints & Sinners has made substantial and tangible advances toward entering the market for skincare products.

> 36. Saints & Sinners has invested substantial resources in research, development, and marketing efforts to launch its skincare line. These efforts have included collaboration with multiple manufacturers and chemists specializing in cosmetic formulation.

> 37. Additionally, Saints & Sinners has evaluated hundreds of lab samples, including cleanser, moisturizer, creams, cleansers, toners, masks, skin treatments, and serums, and has conducted ingredient research, including analysis of competing products to ensure product quality and differentiation.

> 38. Saints & Sinners has completed formulation of its initial skincare products, and is working on those that will follow.

> 39. Saints & Sinners has negotiated and secured contracts for manufacturing, packaging, and fulfillment of its skincare products.

40. These efforts have progressed to the point that Saints & Sinners is ready to launch its skincare line upon finalization of product attributes and regulatory review. Saints & Sinners' first skincare products are scheduled for imminent commercial launch through Saints & Sinners' website and existing retail partners, including Amazon and the Shopify SHOPApp.

41. Saints & Sinners' forthcoming skincare products will directly compete with the serums, creams, and other topical formulations marketed and sold under Defendants' brand. Specific overlap exists between Saints & Sinners' planned products and a number of the current offerings marketed and sold by Defendants, namely: cleanser; moisturizer; creams; cleansers [sic]; toners; masks; skin treatments; and serums, all in Class 3 (see FAC ¶ 54).

42. Saints & Sinners will directly compete for the same consumer base as Defendants in national online channels and in the U.S. beauty market, as both parties sell through e-commerce to the same general consumer demographics seeking moisturizing, antioxidant, and anti-aging skincare products. The two lines will target the same customer demographics—customers seeking luxury and performance skincare products—and will be sold through substantially overlapping channels, including online retail/ecommerce platforms.

SAC ¶¶ 35–42.

Paragraphs 35 and 36 also appeared in the First Amended Complaint that the Court held insufficient, and paragraphs 37 and 38 are modifications of allegations that appeared therein. Paragraphs 39 through 42 are new to the Second Amended Complaint.

Plaintiff's cofounder Diana Wilson submits a declaration in opposition to Defendants' Motion for Summary Judgment that provides additional context. Extrinsic evidence is not strictly before the Court on the Motion to Dismiss, but can inform questions of leave to amend. According to Wilson, Plaintiff ordered its first skincare product from a supplier in September 2025, intended (as of her October 3, 2025 declaration) to "hold[] a photo shoot for the first skincare product in November 2025," and scheduled the launch of the product for December 2025. ECF No. 78-1, ¶¶ 34–36.[3] Neither Wilson's declaration nor Plaintiff's Second Amended Complaint specified what the first product would be, which products are slated to follow it in the near future, or when subsequent products will come to market. At the November 4, 2025 hearing,

---

[3] The first product launch date appears to have advanced somewhat since Plaintiff's September 18, 2025 opposition to the Motion to Dismiss, where counsel represented that "since filing the SAC, Plaintiff's preparations regarding its skincare line have progressed to the point that, if given leave for further amendment, it can allege an approximate launch date in 2026." ECF No. 75 at 16–17.

the parties represented that Plaintiff has announced the launch of a "hair and body oil" product, but that representation strays beyond any allegation of the Second Amended Complaint.

### B.    Legal Standard

#### 1.    Rule 12(b)(6)

A complaint may be dismissed under Rule 12(b)(6) of the Federal Rules of Civil Procedure "based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Godecke v. Kinetic Concepts, Inc.*, 937 F.3d 1201, 1208 (9th Cir. 2019) (citation and internal quotation marks omitted). A complaint generally must include a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).[4]

A court reviewing a 12(b)(6) motion must "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Outdoor Media Group, Inc. v. City of Beaumont*, 506 F.3d 895, 900 (9th Cir. 2007). "Threadbare recitals of the elements of a cause of action . . . do not suffice," however, and a court need not credit "legal conclusions" or "mere conclusory statements." *See Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). The allegations in the complaint "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A complaint must demonstrate "facial plausibility" by pleading "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

A court's review under Rule 12(b)(6) is generally limited to the contents of a complaint, with the exception of materials incorporated by reference in a complaint or materials subject to judicial notice. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018). A court generally should not dismiss a complaint with prejudice under Rule 12(b)(6) unless it is clear the complaint cannot be saved by any amendment. *See United States v. Corinthian Colleges*, 655 F.3d 984, 995 (9th Cir. 2011). "[L]eave to amend should be freely granted 'when justice so requires.'" *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (quoting Fed. R. Civ. P. 15(a)).

---

[4] Rule 9(b)'s more stringent pleading standard for claims sounding in fraud is discussed separately below.

United States District Court
Northern District of California

1  Generally, leave to amend may be denied only if allowing the amendment would unduly prejudice

2  the defendant, cause undue delay, or be futile, or if the plaintiff has acted in bad faith.  *Leadsinger,*

3  *Inc. v. BMG Music Publ'g*, 512 F.3d 522, 532 (9th Cir. 2008).

### 2.    Rule 12(b)(1)

5  Defendants' Motion to Dismiss cites Rule 12(b)(1) in addition to Rule 12(b)(6).  A motion

6  to dismiss for lack of Article III constitutional standing implicates a district court's subject matter

7  and is properly brought under Rule 12(b)(1).  Defendants bring only a facial challenge to

8  jurisdiction addressing the sufficiency of Plaintiff's allegations, rather than a factual challenge

9  based on extrinsic evidence.  *See Bowen v. Energizer Holdings, Inc.*, 118 F.4th 1134, 1142 n.6

10  (9th Cir. 2024); *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014).  The standard of review

11  for a facial challenge to jurisdiction is substantially identical to the standard for a motion under

12  Rule 12(b)(6) discussed above.  *Leite*, 749 F.3d at 1121.

### 3.    Rule 9(b)

14  Claims sounding in fraud are subject to a heightened pleading standard under Rule 9(b) of

15  the Federal Rules of Civil Procedure.  A false advertising claim is generally subject to that rule,

16  but Plaintiff argues in its opposition brief that "the heightened pleading requirements of Rule 9(b)

17  are directed at the factual sufficiency of the allegations of fraud—not at the issue of whether a

18  plaintiff has standing to pursue such a claim."  ECF No. 75 at 9.  Plaintiff offers no authority

19  supporting that assertion, instead citing only one case for the proposition that "dismissals under

20  Rule 9(b) are 'functional[ly] equivalent' to dismissals under Rule 12(b)(6) and should be without

21  prejudice if defects are curable."  *Id.* (quoting *Vess v. Ciba–Geigy Corp. USA,* 317 F.3d 1097,

22  1107 (9th Cir. 2003)) (extraneous space omitted).  That case does not speak to the question of

23  whether a plaintiff must plead either constitutional standing or a Lanham Act injury to a plaintiff's

24  commercial interests with particularity under Rule 9(b) to pursue a claim sounding in fraud.[5]

---

[5] In a case not addressed by the parties, the Ninth Circuit has held that if a claim is "grounded in fraud," as opposed to alleging "some fraudulent and some non-fraudulent conduct," then "the pleading of that claim as a whole must satisfy the particularity requirement of Rule 9(b).  *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103–04 (9th Cir. 2003).  But that case did not consider whether the claim "as a whole" includes allegations related to Article III standing or the Lanham Act's commercial injury requirement.

Despite having raised arguments under Rule 9(b) in their previous motion to dismiss, Defendants do not address Rule 9(b) in either their present motion or their reply brief. *See generally* ECF Nos. 64, 77; *cf.* ECF No. 60 at 18–20 (dismissing Plaintiff's false advertising claim for failure to allege falsehood with particularity as required by Rule 9(b), with leave to amend). The Court might reasonably conclude that Defendants have waived any argument based on Rule 9(b) by failing to address it even after Plaintiff argued that it does not apply to the issues in dispute.

As discussed below, Plaintiff's false advertising claims are subject to dismissal even under the less demanding standard of Rule 12(b)(6). The Court therefore assumes for the sake of argument that the Rule 12(b)(6) standard applies, and need not resolve whether Rule 9(b) governs allegations of standing in support of a claim sounding in fraud or allegations of the nature and imminence of an injury in a Lanham Act false advertising case.

### C.    Analysis

With respect to the false advertising claims, Defendants challenge both Plaintiff's standing under Article III of the Constitution and whether Plaintiff has alleged an injury meeting the statutory requirements of the Lanham Act.

The constitutional issue turns on the imminence of Plaintiff's alleged risk of harm. "From Article III's limitation of the judicial power to resolving 'Cases' and 'Controversies,' and the separation-of-powers principles underlying that limitation, [courts] have deduced a set of requirements that together make up the 'irreducible constitutional minimum of standing.'" *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125 (2014) (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992)). "The plaintiff must have suffered *or be imminently threatened with* a concrete and particularized 'injury in fact' that is fairly traceable to the challenged action of the defendant and likely to be redressed by a favorable judicial decision." *Id.* (emphasis added). The Supreme Court has "repeatedly reiterated that threatened injury must be *certainly impending* to constitute injury in fact, and that allegations of *possible* future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (cleaned up).

To establish a cause of action under the Lanham Act, "a plaintiff must allege an injury to a

commercial interest in reputation or sales." *Lexmark*, 572 U.S. at 131–32.  The Lanham Act

encompasses "likely" injuries in addition to actual past injuries, and the Ninth Circuit has

"generally presumed commercial injury when defendant and plaintiff are direct competitors and

defendant's misrepresentation has a tendency to mislead consumers."  *TrafficSchool.com, Inc. v.*

*Edriver Inc.*, 653 F.3d 820, 825, 826 (9th Cir. 2011).  A plaintiff can meet that burden "using

actual market experience and *probable* market behavior," which in the absence of "lost sales data"

might be done by "creating a chain of inferences showing how defendant's false advertising could

harm plaintiff's business."  *Id.* at 825 (cleaned up) (discussing Article III standing, before turning

to Lanham Act injury).

Those two standards require distinct inquiries, but they inform one another.  At least in the

typical Lanham Act false advertising case, the injury at issue in the Article III analysis of actual or

imminent harm is the commercial injury to reputation or sales that the statute requires for a viable

claim.  Plaintiff does not suggest here some other Article III injury distinct from what is statutorily

cognizable under the Lanham Act.  This Order therefore addresses these two requirements in turn,

but in considering Article III standing, this Order focuses on the sort of injury at issue under the

Lanham Act—harm to reputation or sales, which generally arises from direct competition.

### 1.    Article III Standing

In *Lujan*, environmental plaintiffs' "mere profession of an intent, some day, to return" to

sites allegedly harmed by the challenged projects was insufficient to satisfy Article III's injury

requirement.  The Supreme Court reasoned:

> Although "imminence" is concededly a somewhat elastic concept, it
> cannot be stretched beyond its purpose, which is to ensure that the
> alleged injury is not too speculative for Article III purposes—that the
> injury is *certainly* impending.  It has been stretched beyond the
> breaking point when, as here, the plaintiff alleges only an injury at
> some indefinite future time, and the acts necessary to make the injury
> happen are at least partly within the plaintiff's own control. In such
> circumstances we have insisted that the injury proceed with a high
> degree of immediacy, so as to reduce the possibility of deciding a case
> in which no injury would have occurred at all.

504 U.S. at 564 n.2.

Both parties cite Judge Armstrong's decision in *Tercica, Inc. v. Insmed Inc.*, No. C 05-

United States District Court
Northern District of California

5027 SBA, 2006 WL 1626930 (N.D. Cal. June 9, 2006), which held that a plaintiff could bring a false advertising claim against an intended competitor in the pharmaceutical industry where the plaintiff had obtained "FDA approval . . . and product distribution [was] likely imminent." 2006 WL 1626930, at \*17. Judge Armstrong distinguished a decision by the Second Circuit holding that a party[6] lacked standing where his "hopes of eventually obtaining FDA approval and selling a retail weight loss product" in competition with his opponent's products were "too remote at this stage to confer standing." *PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105, 1112 (2d Cir. 1997). The Second Circuit "share[d] the . . . district court's concern that it [was] unclear when (if ever) [the party] would have an FDA-approved, marketable consumer product." *Id.* at 1112 n.7.

The parties also discuss a line of cases addressing plaintiffs seeking declaratory judgment that their forthcoming products do not infringe a defendant's intellectual property. The Court finds those cases less applicable to the issue at hand. In that context, courts and commentators have stated that "actively preparing to produce the article in question" is sufficient as "the last point before the point of no return," because "[a]ny further action on [the plaintiff's] part may well cause him to be liable as an infringer, and the [Declaratory Judgment] Act is designed to prevent the necessity of acting at one's peril." *E.g.*, *G. Heileman Brewing Co. v. Anheuser-Busch, Inc.*, 873 F.2d 985, 990–91 (7th Cir. 1989) (quoting a treatise) (final set of brackets in original).

But this is not a case under the Declaratory Judgment Act, and the relevant considerations differ. When a plaintiff seeks declaratory judgment that its product does not infringe another party's rights, the plaintiff would risk liability for damages if it brought its product to market before obtaining a ruling in its favor. Here, in contrast, Plaintiff does not risk liability by bringing its skincare products to market before the dispute over Defendants' allegedly false advertising is resolved. To the extent that the District of Delaware has relied on *G. Heileman* in a non-declaratory judgment Lanham Act case, this Court respectfully disagrees that such authority is the

---

[6] There, the party in question was a defendant facing a declaratory judgment action challenging his standing to bring false advertising claims that he had threatened to pursue against the plaintiff, thus presenting essentially the same question as here but with the parties' nominal roles reversed. *See PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105, 1107 (2d Cir. 1997); *Tercica*, 2006 WL 1626930, at \*17 n.19.

best source of guidance in this context.  *See Joint Stock Soc'y v. UDV N. Am., Inc.*, 53 F. Supp. 2d 692, 702–04 & n.8 (D. Del. 1999) (holding that plaintiffs "fail[ed] to satisfy the 'actual controversy' requirement under the Declaratory Judgment Act," despite acknowledging that they did not assert a claim under that statute and were "not seeking declaratory judgment"), *aff'd*, 266 F.3d 164 (3d Cir. 2001).

The framework applied in *Tercica* better addresses the circumstances of this case.  So long as there are necessary steps beyond Plaintiff's control, or doubt as to if or when a competing product will actually come to market, Plaintiff has alleged only "*possible* future injury" as a result of Defendants' purportedly false advertising, rather than the "*certainly impending*" injury necessary "to constitute injury in fact."  *See Clapper*, 568 U.S. at 409.  Plaintiff alleges here that its products remain subject to "finalization of product attributes and regulatory review" before they come to market, raising questions of whether their launch could still be derailed.  SAC ¶ 40.  Those allegations more closely resemble the Second Circuit's decision in *PDK Labs*, where a party's intent to launch a product only if he obtained FDA approval was "too remote . . . to confer standing," 103 F.3d at 1112, than the plaintiff in *Tercica* that had obtained the necessary approval and was ready to launch its product, 2006 WL 1626930, at *17.

*Tercica* and *PDK* addressed imminence and likelihood of potential harm in the context of the Lanham Act's statutory requirements (what those courts called "statutory standing"), but those issues are also relevant to Article III standing, and those courts' analysis of them is persuasive in that context as well.  This Court notes that those earlier cases predated *Lexmark*'s emphasis on the distinction between the Lanham Act's injury requirement and any form of "standing," and thus may have been more inclined to conflate those issues.  Even if this Order's analysis of imminent injury might be better categorized as a question of statutory requirements than as one of Article III standing, however, the outcome is the same: the false advertising claims must be dismissed.

Wilson's declaration also makes clear that only one product was potentially ready for an *imminent* launch, without disclosing what that product was.  ECF No. 78-1, ¶¶ 34–36.  Even if Plaintiff had alleged in its Second Amended Complaint that one product was ready to launch in a matter of months (as Wilson states in her declaration), and even if the Court credited counsel's

1    representations at the hearing that Plaintiff is launching a "hair and body oil" product, it is not

2    clear which of Defendants' products that will compete with.[7]  The Court therefore cannot say

3    which if any allegedly false claims by Defendants pose a sufficiently imminent threat of harm to

4    Plaintiff to satisfy Article III.  *See* SAC ¶¶ 55, 58, 59 (listing specific claims about specific

5    products as purportedly false).

6         Accordingly, Defendants' Motion to Dismiss is GRANTED as to Plaintiff's claim for

7    false advertising under the Lanham Act and Plaintiff's claim under the UCL to the extent that it

8    rests on a theory of false advertising.

9                         **2.    Lanham Act Commercial Injury**

10        Plaintiff's failure to allege sufficient Article III standing is enough to grant the Motion to

11   Dismiss, but the parties' arguments regarding the Lanham Act's injury requirement remain

12   relevant to whether to grant leave to amend.  As discussed above, a "likely" injury can be

13   sufficient to support a Lanham Act false advertising claim, and direct competition is generally

14   sufficient to support a presumption that one competitor's misleading misrepresentations

15   commercially injured another competitor.  *TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820,

16   825, 826 (9th Cir. 2011).  Defendants nevertheless contend that Plaintiff not only has not but

17   cannot allege the sort of injury necessary to support its false advertising claims.

18        Defendants argue, as they did in their previous motion to dismiss, that the Ninth Circuit's

19   decision in *ThermoLife* bars Plaintiff's claims.  *See* ECF No. 77 (Reply) at 6.  In that unpublished

20   disposition, a plaintiff alleged that it sold nutritional supplements that touted the same health

21   benefits as the defendant's supplements.  2022 WL 612669, at *3.  Affirming dismissal on the

22   pleadings, the panel held such allegations insufficient to "show direct competition" where the

23   plaintiff "failed to allege any facts that show consumers consider its products to be substitutes with

24   [the defendant's] products" and "did not provide any photographs of [the parties'] products listed

25   side-by-side" or "any customer review stating a preference for one over the other."  *Id.*  But

26   

27   ——————————————
     [7] Contrary to Plaintiff's arguments at the hearing, it is not clear that all skincare products compete
     with one another.  Someone shopping for a "needle-free filler serum," *see* ECF No. 67-19 at 49,
28   might, for example, have no interest in an eye cream as a potential alternative purchase, *see* ECF
     No. 67-20 at 6.  *See also* SAC ¶ 55 (discussing both products).

                                              13

United States District Court
Northern District of California

United States District Court
Northern District of California

*ThermoLife* did not speak to what a prospective market entrant (as opposed to a current competitor) must allege to establish "imminent" direct competition, nor is it a precedential decision. Plaintiff of course cannot allege side-by-side product placement or stated customer preferences with respect to a product that has not yet come to market. Imposing such a requirement here would conflict with the statute's requirement of only a likelihood of injury, *TrafficSchoo.com*, 653 F.3d at 825, and with caselaw allowing such a claim to proceed where competition was "likely imminent" but had not yet commenced, *Tercica*, 2006 WL 1626930, at *17.

Defendants also cite *ThermoLife*'s reliance on a reference in the Supreme Court's *Lexmark* decision to "something very close to a 1:1 relationship" between parties' respective sales. *See ThermoLife*, 2022 WL 612669, at *2 (citing *Lexmark*, 572 U.S. at 139). *Lexmark* addressed that relationship in the context of opposing parties who were not direct competitors, but where the defendant's purportedly false advertising affected sales of a product that incorporated the plaintiff's product. 572 U.S. at 139. The Supreme Court found "no question that proximate cause is satisfied" under such circumstances, without suggesting that such a direct relationship is *necessary* to proximate cause or standing. *Id.* (citation and internal quotation marks omitted). In *ThermoLife*, the Ninth Circuit also addressed *Lexmark*'s "1:1 relationship" in the context of a plaintiff that did not allege direct competition with the defendant. 2022 WL 612669, at *2. The court did *not* address that standard in the context of the other plaintiff discussed above that unsuccessfully tried to allege direct competition. *Id.* at *3. Neither *ThermoLife* nor *Lexmark* supports Defendants' suggestion that a competitor in a "market [with] numerous participants" lacks a sufficient expectation of "'automatically' displace[d]" sales to support standing under the Lanham Act—a premise that would seem to preclude most if not all Lanham Act false advertising claims in typical markets with multiple competitors. *Cf.* ECF No. 77 at 6. In the absence of authority, the Court declines to so hold.

Plaintiff alleges here that it intends to sell products in the same categories ("moisturizer; creams; cleansers; toners; masks; skin treatments; and serums") touting the same benefits ("moisturizing, antioxidant, and anti-aging") and targeting the same segment ("customers seeking

14

luxury and performance skincare products") of the U.S. national skincare market, through overlapping online shopping channels.  SAC ¶ 42.  Such allegations go beyond the conclusory assertions of Plaintiff's First Amended Complaint.  Under these circumstances of a plaintiff alleging *likely* injury based on its forthcoming product, the Court finds those allegations sufficient to support a plausible inference that, *if or when* Plaintiff's products come to market, at least some of them will compete directly with at least some of Defendants' products.  Such direct competition would in turn support a "presumed commercial injury" sufficient for a false advertising claim under the Lanham Act.  *TrafficSchool.com*, 653 F.3d at 826.  As discussed above, however, Plaintiff has not yet plausibly alleged that it has begun or will imminently begin selling any product that competes directly with Defendants.

### 3.    Leave to Amend

Once again, it appears that Plaintiff could potentially amend to cure its lack of Article III standing[8] with respect to at least some of the purportedly false claims at issue.

As Defendants note, standing is generally "measured as of the time the complaint is filed." ECF No. 77 at 5 n.2 (citing *Arizona v. Yellen*, 34 F.4th 841, 848 (9th Cir. 2022)).  At the hearing, they argued that principle weighed against allowing leave to amend.  But an amended or supplemental complaint can be appropriate if a plaintiff acquires standing after an earlier complaint is filed, and standing is then measured at the time of filing that amended or supplemental complaint.  *Northstar Fin. Advisors Inc. v. Schwab Invs.*, 779 F.3d 1036, 1043–48 (9th Cir. 2015).

It is also not clear that amendment would be futile on the merits.  At the hearing, Defendants made factual assertions about Plaintiff's forthcoming product that, in Defendants' view, establish a lack of direct competition, but those facts are not in the record.  Plaintiff also may be able to allege an actual or imminent launch of additional products that compete more directly with Defendants' products.

If Plaintiff wishes to pursue its false advertising claims, and can allege actual or imminent

---

[8] Or any failure to meet the Lanham Act's injury requirement, if Plaintiff's failure to show *imminent* direct competition were so construed.

United States District Court
Northern District of California

1   direct competition, Plaintiff may file a third amended complaint or a supplemental complaint

2   under Rule 15(d) no later than February 17, 2026.  Any such amended or supplemental complaint

3   may not alter or add any other claims except for Plaintiff's claims for false advertising in violation

4   of the Lanham Act and the UCL.

5           The Court recognizes that any amended or supplemental pleading may face another motion

6   to dismiss.  At the hearing, defense counsel also suggested the possibility of a third-party claim

7   against Defendants' supplier.  Such developments could mean that bringing Plaintiff's false

8   advertising claims to trial (if they survive further motion practice) would unduly delay trial of

9   Plaintiff's trademark claims.  If Plaintiff amends or supplements its complaint to pursue false

10  advertising claims, the parties shall meet and confer and be prepared to address at the February 26,

11  2026 case management conference whether those claims should be bifurcated from Plaintiff's

12  trademark claims and tried separately at a later date.

13  **IV.     MOTION FOR SUMMARY JUDGMENT ON TRADEMARK CLAIMS**

14          Defendants move for summary judgment on Plaintiff's "Trademark Claims," without

15  defining which claims that term encompasses.[9]  Based on Plaintiff's allegations in the Second

16  Amended Complaint, the Court construes the Motion for Summary Judgment as directed to all

17  claims except: (1) Plaintiff's third claim, for false advertising; and (2) Plaintiff's fourth claim, for

18  violation of the Unfair Competition Law, *to the extent* that claim is based on false advertising

19  rather than trademark infringement.  All other claims rely essentially on allegations of trademark

20  infringement.

21          Defendants move for summary judgment solely on the issue of likelihood of confusion.

22  The Court's analysis below presumes the parties' familiarity with the Order addressing

23  Defendants' previous Motion to Dismiss, which also addressed that issue in detail.  ECF No. 60 at

24  6–15.

25  _____

26  [9] Defendants' Proposed Order does not resolve the ambiguity.  The Proposed Order reads as
    follows: "Upon consideration of the Motion for Summary Judgment on Trademark Claims filed by

27  [Defendants], the documents and pleadings of record in this matter, and any other evidence or oral
    argument that the Court may consider in connection with this Motion, and with good cause

28  thereby appearing, it is hereby ORDERED that Defendants' Motion is GRANTED."  ECF No.
    67-24.

United States District Court
Northern District of California

United States District Court
Northern District of California

1

### A.    Evidentiary Record

2    The following summary is included for the convenience of the record.  It is not a complete

3    statement of the relevant evidence, and should not be construed as resolving any issue of fact that

4    might be disputed at trial.

5    ### 1.    Plaintiff's Mark and Products

6    Plaintiff has used its horizontal double-S mark since at least 2016 on various haircare

7    products.  ECF No. 78-1, ¶ 3–4.  Plaintiff holds two trademark registrations related to that mark:

8    U.S. Registration Nos. 5,097,396 and 5,097,386, both issued in 2016.  *Id.* ¶ 6.  The mark appears

9    on many (perhaps all) of Plaintiff's products, typically with the double-S mark positioned above

10    Plaintiff's "Saints & Sinners" trade name, which is in turn positioned above a product title.  *See id.*

11    Exs. E–J.  Plaintiff's product packaging tends to be a solid color or gradient,[10] with the mark and

12    text generally displayed in monochrome white, silver, or black.  *See id.*; *see also, e.g.*, ECF Nos.

13    67-4, 67-14, 67-15, 67-16.

14    Plaintiff's products have appeared in "trade publications and print and online magazines

15    . . . including *Allure*, *PopSugar*, *Star Magazine*, *NewBeauty Magazine*, and *Beauty Launchpad*,"

16    and have been used by celebrities attending public events.  ECF No. 78-1, ¶ 14 & Ex. F.  Plaintiff

17    markets its products in part through social media, including Facebook, Instagram, X, and TikTok.

18    *Id.* ¶ 15 & Ex. G.  Plaintiff also uses social media influencers to advertise its products.  ECF No.

19    67-3 at 15–16 (response to Request for Admission (RFA) No. 66).

20    Plaintiff sells its products in the United States and Canada through its own website and

21    other retailers and e-commerce platforms, including Amazon, Shopify's Shop.app platform, and

22    the Canadian retailer Holt Renfrew.  ECF No. 78-1, ¶¶ 16–19 & Exs. H–J.  "[M]ost Saints &

23    Sinners products are sold at suggested retail prices ranging from $20 to $95, dependent on product

24    and size, which," according to Plaintiff's cofounder Diana Wilson, "is a typical price point for

25    luxury haircare products."  *Id.* ¶ 21; *see also* ECF No. 67-7 at 2.  Plaintiff also distributes its

26    products through third-party beauty subscription boxes.  ECF No. 78-1, ¶ 20.  Plaintiff sells

27

28    [10] Though some products, particularly those sold in aerosol cans, have a background pattern
consisting of numerous instances of Plaintiff's mark.  *E.g.*, ECF No. 67-4 at 7.

United States District Court
Northern District of California

1    products to both to haircare professionals and to individual end users.  ECF No. 67-3 at 13

2    (response to RFA No. 61).

3        Plaintiff has "incorporated skincare ingredients in its haircare products, with a focus on

4    scalp health."  ECF No. 78-1, ¶ 27. As discussed above in the context of Defendants' Motion to

5    Dismiss, Wilson states in her declaration that Plaintiff has been developing skincare products

6    since 2019.  *Id.* ¶ 28.  She states that "[t]here is specific overlap between Sants & Sinners'

7    forthcoming skincare products and several current offerings marketed and sold by Defendants,

8    including cleansers, moisturizers, creams, toners, masks, skin treatments, and serums."  *Id.* ¶ 24.

9    According to Wilson, Plaintiff had ordered its first skincare product as of the time of her October

10   2025 declaration, and was prepared to launch it in December, with other products to follow.  *Id.*

11   ¶¶ 30–36.

12                 **2.    Defendants' Mark and Products**

13       Defendant Holly Cutler started a medical spa or clinic, called FACE, in Michigan in 2004.

14   ECF No. 67-19 at 10 (Cutler Dep. at 13:6–11).  The clinic offers services that include facials, laser

15   and injectable treatments, naturopathic medicine, IV therapy, and other wellness services.  *Id.* at

16   12–14 (Cutler Dep. at 15:1–17:12).[11]  Defendants have never sold haircare products or services

17   and Cutler has no intention of doing so.  *Id.* at 9, 42 (Cutler Dep. at 12:16–22, 75:22–25).

18       Cutler developed the idea for her "Skin Saint" brand in 2017, to sell more skincare

19   products and offer additional skincare services.  *Id.* at 16–17 (Cutler Dep. at 19:14–20:5).

20   Defendant Face Co., LLC is a business entity related to Cutler's FACE clinic, and Defendant Skin

21   Saint LLC is a newer business entity intended to sell Cutler's skincare products.  In July 2024

22   when Cutler sat for her deposition in connection with the pertinent  administrative proceedings,

23   Defendants were beginning to separate Skin Saint and Face Co.'s business operations.  ECF No.

24   67-19 at 15–16 (Cutler Dep. at 18:18–19:4).

25   _____

26   [11] Some of Defendants' factual description of their medical spa service—e.g., that "[a]ll skin care
     treatments are performed in person after consultations by licensed professionals" from "a team of
27   doctors, nurses, aestheticians, nurses, technicians and assistants"—are based entirely on citations
     to their own websites, not evidence in the record.  ECF No. 67 at 11 & nn.15–17.  But the outcome
28   of the present Motion would not differ if Defendants had offered those descriptions through
     competent evidence.

United States District Court
Northern District of California

1    Defendants previously used marks consisting of the words "THE SKIN SAINT," with the

2    word "THE" sometimes rotated ninety degrees from the other text, a halo over the first letter "N,"

3    the word "SAINT" generally in a gold-colored gradient, and the other words sometimes in

4    different colors.  ECF No. 67-19 at 49–50; ECF No. 78-2 at 122; *see also* ECF No. 67-19 at18–21

5    (Cutler Dep. at 23:3–26:16).

6    Cutler testified at a deposition that she used a "logo generator" to develop a new mark in

7    2020, and settled on the double-S mark at issue in this case because it was visually appealing and

8    resembled Defendants' logo for the FACE clinic, which "is a wave with an F."  ECF No. 67-19 at

9    24–26 (Cutler Dep. at 31:8–33:16); *see* ECF No. 67-20 at 2 (FACE logo).  At that time, she did

10    not research whether the mark was similar to other marks used by other companies.  ECF No.

11    67-19 at 41 (Cutler Dep. at 71:9–13).  Defendants began using the mark in commerce around the

12    end of 2021.  ECF No. 78-2 at 13–14 (Cutler Dep. at 37:15–38:15).

13    Many of Defendants' products display Defendants' double-S mark positioned vertically

14    above the words "SKIN SAINT," in turn above a product name or description.  The packaging is

15    white and the mark and text are black.  *E.g.*, ECF No. 67-20 at 3–4, 6; ECF No. 78-2 at 104, 107,

16    117.  Some products with different form factors use somewhat different configurations, such as

17    the product name positioned to the right of the double-S mark, but use the same monochrome

18    color scheme.  ECF No. 78-2 at 109.

19    Defendants market their products in part through Instagram, including through paid

20    promotions.  ECF No. 78-2, ¶ 13 & Ex. I; ECF No. 67-19 at 33 (Cutler Dep. at 59:5–19).  They

21    also market or have marketed their products through Facebook, ads on Google, emails, product

22    placement in magazines, and appearances on local and national television.  ECF No. 67-19 at 33–

23    34 (Cutler Dep. at 59:5–60:24).  Defendants have at times used a public relations agency to secure

24    magazine product placements.  *Id.* at 34 (Cutler Dep. at 60:14–17).[12]

25    

26    [12] Defendants assert in their Motion: "Since the rebrand in 2021, however, the SKIN SAINT skin
care product line has been marketed primarily to clients frequenting the FACE medical spa in

27    person, and on the Defendants' social media and websites.  There have been no television
appearances by Ms. Cutler and only one magazine editorial since the rebrand."  ECF No. 67 at 12.

28    The deposition testimony that they appear to cite for those assertions does not support them.  ECF
No. 67-19 at 33–34 (Cutler Dep. at 59:23–60:17).  To the extent Defendants rely on a citation to

Defendants sell their products only from their clinic in Michigan and through their website, from which they distribute products nationally.  ECF No. 67-19 at 30–32 (Cutler Dep. at 54:21–56:6).  Cutler testified that Defendants are not "limiting [themselves] to just [their] clinic in the future" and qualified other answers as stating that Defendants are not "currently" selling their products elsewhere, suggesting that Defendants might later sell through other outlets or distributors.  *Id.* at 31–32 (Cutler Dep. at 55:19–56:6).  Since they began using the accused double-S mark in 2021, Defendants have sold significantly more Skin Saint products through their clinic than through their website.  ECF No. 66-6 (provisionally under seal).

### 3.    Administrative Proceedings and the Parties' Potential Competition

The U.S. Patent and Trademark Office approved Defendants' trademark application for their double-S mark and published it for opposition on September 19, 2023.  ECF No. 67-1, ¶ 23. Plaintiff first learned of Defendants and their mark from a trademark watch report that month. ECF No. 67-2 at 13 (response to RFA No. 15).  That report characterized Defendants' mark as "Level 4," corresponding to "Low risk" of conflict with Plaintiff's mark.  ECF No. 67-18. Defendants first learned of Plaintiff and its mark when Plaintiff opposed Defendants' trademark application.  *See* Cutler Dep. at 63:22–64:1.

Shop.app is a "a search tool to find and purchase products that are offered for sale by brand owners from a Shopify store," including websites like Defendants' that are "powered by Shopify." ECF No. 80-20, ¶ 4.  Plaintiff's counsel Karl Kronenberger offers "screenshots of searches [he] personally conducted on the SHOP.app website" that show some of Defendants' products among search results for the search query "Saints and Sinners skincare" and other similar queries.  ECF No. 78-2, ¶ 10 & Ex. F.  Plaintiff's cofounder Wilson also states in her declaration that queries on Shop.app for Plaintiff's "Saints & Sinners" trade name in conjunction with the word "skincare" return results that include Defendants' products.  ECF No. 78-1, ¶ 26.  Defense counsel Fatima Mobin was unable to replicate those results and did not find any of Defendants' products when running the same searches on Shop.app.  *See generally* ECF No. 80-2.  Defendants' sales through

_____

the press page of their own website, *see* ECF No. 67 at 12 n.20, that is not evidence in the record.

United States District Court
Northern District of California

United States District Court
Northern District of California

Shop.app are limited, with only 28 orders for a total of $2,468 in the first ten months of 2025 and less in 2024.  ECF No. 80-20, ¶ 4.

Plaintiff is not aware of specific instances of consumer confusion between Plaintiff's and Defendants' products, consumers who have purchased both parties' products, or any lost sales or other direct harm to Plaintiff as a result of Defendants' products.  ECF No. 67-2 at 7–13 (responses to RFA Nos. 3–9, 11, 12, and 14); ECF No. 67-3 at 30 (responses to RFA Nos. 105 and 106).  A Google search for either party's name does not return the other party's website or products in the first ten pages of results.  ECF No. 67-3 at 24–25 (responses to RFA Nos. 90 and 921).

### 4.    Other Marks and Market Conditions

Defendants have identified several other participants in the skincare and haircare industries that use marks incorporating two instances of the letter S.  *See* ECF No. 67 at 13–16; ECF Nos. 54-9 through 55-13.  None of those companies use the words "saint" or "sinner" in their trade names.  *See id.*  Plaintiff has not received any reports of confusion regarding those or any other products.  ECF No. 67-2 at 11 (response to RFA No. 11).

Plaintiff relies in part on an expert declaration of Karen Young, "a beauty industry consultan[t] specializing in market strategy and consumer behavior across skincare, haircare, and adjacent personal care categories" with "over 25 years of experience advising global beauty brands on product category trends, consumer perception, and ecommerce buying behavior."  ECF No. 78-3 (Young Decl.) ¶¶ 1–2.  Young has also "been an adjunct professor at The Fashion Institute of Technology (FIT) in NYC for 21 years, teaching product development [and brand differentiation] in their graduate program."  *Id.* ¶ 13.  She offers opinions on trends towards a convergence of the haircare and skincare markets, impulse buying of beauty products in the social media era, and likelihood of consumer confusion.  *See generally id.*

According to Young, there is a current trend towards the "skinnification of hair," with haircare products and routines increasingly focusing on scalp care.  *Id.* ¶¶ 6–9.  "Industry reports and commentary . . . confirm consumer-facing manifestations" of that trend, including that "major brands well known for skincare" have begun to offer haircare products.  *Id.* ¶ 9.

1    Young also reports that "industry studies and market research confirm that platforms such

2    as TikTok and Instagram have materially increased impulse buying among beauty consumers."

3    *Id.* ¶ 11.  She states that "in e-commerce and social commerce environments, beauty consumers

4    rely most heavily on visual brand identifiers such as name, logo, and iconography rather than

5    detailed product analysis," particularly for "mass and salon-grade products" in the $20 to $45

6    price range.  *Id.* ¶ 12.  In Young's view, "these market conditions" support a "significant

7    likelihood of confusion" between the parties.  Finally, Young asserts that the term "medical

8    grade," used in Defendants' marketing, "has no recognized meaning within the skincare industry."

9    *Id.* ¶ 16.

10           **B.    Legal Standard**

11           To prevail on a motion for summary judgment, a movant must "show[] that there is no

12   genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

13   Fed. R. Civ. P. 56(a).

> In considering a motion for summary judgment, the court must examine all the evidence in the light most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). At the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence. *See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n.*, 809 F.2d 626, 630–31 (9th Cir. 1987). However, once the moving party meets the requirements of Rule 56 by showing there is an absence of evidence to support the non-moving party's case, the burden shifts to the party resisting the motion, who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

21   *Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 891 (9th Cir. 2005).

22           On summary judgment, the Court must consider whether the *contents* of evidence offered

23   by the parties would be admissible at trial, even if evidence is not currently offered in a *form* that

24   would be admissible.  *See Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003).

25           **C.    Evidentiary Challenges**

26           Defendants' reply brief is devoted primarily to evidentiary challenges.  Defendants

27   challenge three declarations that Plaintiff offers with its opposition brief: (1) Plaintiff's expert

28   witness Karen Young's declaration, which Defendants contend is conclusory, contradictory, and

United States District Court
Northern District of California

22

improperly directed to ultimate issues of law, ECF No. 80 (Reply) at 10–15; (2) Plaintiff's attorney Karl Kronenberger's declaration to the extent that it presents the results of his internet searches Defendants have been unable to reproduce, *id.* at 15–17; and (3) Plaintiff's co-founder Diana Wilson's declaration, which Defendants contend is self-serving, conclusory, and uncorroborated, *id.* at 18–20. The Court addresses those challenges in turn before considering the Motion for Summary Judgment. As discussed below, Defendants' challenges go primarily to weight and credibility—issues the Court may not properly resolve on summary judgment.

Plaintiff objects to a financial summary as insufficiently authenticated by defense counsel Robert Phillips's declaration. ECF No. 78 at 12–13 (addressing Exhibit T, ECF No. 66-6, filed under seal). Defendant Holly Cutler's reply declaration authenticates the exhibit and asserts that she previously verified it in discovery. ECF No. 80-20, ¶¶ 2–3. The Court is satisfied that Defendants would be able to present the contents of that exhibit in at least some form at trial. *See Fraser*, 342 F.3d at 1036–37.

### 1. Karen Young's Declaration

A party may offer opinion evidence from a "witness who is qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. That rule represents a "relaxation of the usual requirement of firsthand knowledge . . . premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 (1993). Rule 702 of the Federal Rules of Evidence sets forth the following criteria for expert opinion evidence:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Those considerations essentially require a court to consider expert testimony's "reliability

and relevance." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011). They do not call for "a court to admit or to exclude [expert opinion] evidence based on its persuasiveness." *Id.*

"Not all expert testimony requires adherence to a strict methodology." *Richards v. Dep't of Bldg. Inspection*, No. 20-cv-01242-JCS, 2021 WL 5415254, at *16 (N.D. Cal. Nov. 19, 2021). "*Daubert* makes clear that the factors it mentions"—testing, peer review, known error rates, and the like—"do *not* constitute a 'definitive checklist or test.'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999) (quoting *Daubert*, 509 U.S. at 593). "[T]he factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Id.* (citation omitted). Scientific methods "will be at issue in some cases," but "[i]n other cases, the relevant reliability concerns may focus upon personal knowledge or expertise." *Id.*

Defendants argue that Young's opinions regarding "skinnification"—a purportedly increasing crossover between the haircare and skincare markets—are not sufficiently reliable because "they are based simply on internet articles." ECF No. 80 at 12–13. But Defendants offer no competing evidence as to what constitute generally accepted standards for expertise in beauty industry. Young states that she has "advised global and emerging beauty brands for over 25 years on portfolio architecture, brand positioning, and go-to-market channels, including digital commerce and social media ecosystems," and that she bases her opinions on that experience in addition to trade publications. Young asserts that her methodology and sources "are standard in the beauty market research field" and "routinely relied upon by industry professionals and experts to evaluate market trends, consumer confusion, and brand relationships." ECF No. 78-3, ¶ 3. In the absence of competing evidence, and drawing all reasonable inferences in Plaintiff's favor for the purpose of Defendants' Motion for Summary Judgment, the Court is willing to infer that Young's experience and review of trade materials—in conjunction with specific articles she cites—is sufficient to qualify her as an expert in her field capable of testifying to market trends.

Defendants also challenge Young's opinions regarding a rise in impulse buying. They assert that the sources on which she relies do not say that consumers "are prone to mistaking what they are buying or who they are buying from," as opposed to merely describing a rise in use of

24

social media when shopping for beauty products.  ECF No. 80 at 14.  But Young relies on her own extensive experience as a brand consultant in addition to the sources she attaches to her declaration.  In the absence of evidence to the contrary regarding consumer behavior, evidence that Young's qualifications are not generally accepted in her field to address such matters, *or* cross-examination of Young revealing defects in her analysis, the Court is not prepared to exclude her opinions on consumer behavior.  Defendants also contend that those opinions are inapplicable when they do not sell their products directly through social media.  ECF No. 80 at 14.  At least viewing the record in the light most favorable to Plaintiff, however, Young appears to be describing a broader trend in the market that derives in part from social media, rather than specific behavior consumers exhibit only when shopping on social media.

In a footnote, Defendants assert that Young lacks a sufficient basis for her opinion that the term "medical grade" has no recognized definition in the skincare industry.  ECF No. 80 at 13 n.5; *see* ECF No. 78-3, ¶ 16.  Defendants offer no evidence to the contrary, instead vaguely referencing "the SKIN SAINT website" as showing that "medical grade products contain acids, bleaches, sulfur, retinols, and other chemicals."  ECF No. 80 at 13 n.15.  A footnote is not the place for a substantive argument, and the Court is willing to accept for the purpose of the present Motion that Young's experience as a consultant qualifies her to address generally accepted definitions (or lack thereof) in her field.

Defendants seek to exclude Young's opinions on the ultimate issue of consumer confusion as improperly usurping the role of the jury.  ECF No. 80 at 10–11.

> It is well-established . . . that expert testimony concerning an ultimate issue is not per se improper." *Mukhtar v. Cal. State Univ., Hayward*, 299 F.3d 1053, 1066 n. 10 (9th Cir. 2002). Indeed, Fed. R. Evid. 704(a) provides that expert testimony that is "otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." That said, "an expert witness cannot give an opinion as to her *legal conclusion*, i.e., an opinion on an ultimate issue of law." *Mukhtar,* 299 F.3d at 1066 n. 10. Similarly, instructing the jury as to the applicable law "is the distinct and exclusive province" of the court. *United States v. Weitzenhoff*, 35 F.3d 1275, 1287 (9th Cir. 1993) (citations and quotation marks omitted).

*Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004).[13]

Courts sometimes exclude expert opinions that purport to address the ultimate issue of likelihood of consumer confusion. Some courts have held that expert analysis that purports to apply the *Sleekcraft* factors (which Young does not claim to do here) inherently expresses an improper legal opinion. *E.g.*, *YKK Corp. v. Jungwoo Zipper Co.*, 213 F. Supp. 2d 1195, 1203 (C.D. Cal. 2002), *abrogated on other grounds as noted by DenimXworks Inc. v. J.L.J., Inc.*, No. CV 09-07207 SJO (RZx), 2010 WL 11596164, at *3 n.3 (C.D. Cal. Mar. 4, 2010). Others have held simply that opinions on similarities between marks are unlikely to aid the jury or would usurp its role. *Blue Bottle Coffee, LLC v. Liao*, No. 21-cv-06083-CRB, 2023 WL 6850573, at *8 (N.D. Cal. Oct. 16, 2023); *DenimXworks*, 2010 WL 11596164, at *3.

The Court does not rely here on Young's ultimate opinions on likelihood of confusion. For the purpose of this Order, the Court instead credits only her opinions regarding the nature of the relevant market(s), trends in consumer behavior, and other issues that may bear on the ultimate question of likely confusion without purporting to resolve it. The Court reserves the contours of what "ultimate issue" opinions Young may be able to offer at trial for resolution on motions in limine.

### 2.    Karl Kronenberger's Declaration

Plaintiff relies in part on its attorney Karl Kronenberger's declaration and attached screenshots of the Shop.app website. That evidence indicates that Kronenberger "personally" conducted a search for Plaintiff's "Saints and Sinners" trade name in conjunction with the word "skincare," which turned up some of Defendants' skincare products in addition to Plaintiff's existing haircare products (as well as a large number of third-party products). ECF No. 78-2, ¶ 10 & Ex. F.

Defendants argue that such evidence "cannot be replicated and appear manipulated"

---

[13] *Mukhtar*, on which the Ninth Circuit relied in *Hangarter*, was later overruled on other grounds by *United States v. Bacon*, 979 F.3d 766, 770 (9th Cir. 2020) (en banc). *Bacon* addressed only the available remedies if an appellate court determines that a district court erred in its application of the *Daubert* standard, and does not call into question the holdings of *Mukhtar* and *Hangarter* with respect to "ultimate issue" testimony.

United States District Court
Northern District of California

because their own counsel Fatima Mobin attempted the same search without the same results, and because Kronenberger's screenshots are incomplete and appear to reflect him having scrolled far down into search results.  ECF No. 80 at 15–16; ECF No. 80-2 (Mobin Reply Decl.) ¶¶ 2–6 & Exs. A–K.[14]  The only authority Defendants cite for excluding "results which cannot be replicated" relates to scientific or technical expert opinion evidence challenged under the *Daubert* standard, which this is not.  ECF No. 80 at 15 (citing *eDueker v. Csrt Expedited*, No. 2:18-cv-08751-MCS-FFM, 2020 U.S. Dist. LEXIS 231233, at *12–13 (C.D. Cal. Dec. 7, 2020); *Wyatt Tech. Corp. v. Malvern Instruments, Inc.*, No. CV 07-8298 ABC (MANx), 2010 U.S. Dist. LEXIS 166335, at *21–22 (C.D. Cal. Jan. 25, 2010)).  That Mobin's subsequent search produced different results from Kronenberger's does not prove that Kronenberger is lying, and even it did, that would be a classic dispute of credibility that is not amenable to resolution on summary judgment.

On this posture, the Court is not in a position to determine which attorney/witness is telling the truth, or if both of them are.  Presuming counsel's good faith, the Court expects that both attorneys' declarations are truthful and some other factor led to their differing results, but that expectation does not affect the outcome of the present Motion.  Whether intentionally or not, both parties' attorneys have made themselves fact witnesses, and the Court now orders that the parties may take their depositions regarding the limited issue of their Shop.app searches within the time that the parties have reserved for other specific depositions.  *See* ECF No. 84 (Order granting stipulation to allow certain depositions after the close of fact discovery).[15]  The Court declines to disregard Kronenberger's professed search results.

Defendant Holly Cutler asserts in a declaration that "if the Court is inclined to give any

---

[14] Defendants also note that one page of Kronenberger's screenshots displays a URL in the bottom left corner that resolves to a product sold by non-party Alastin Beauty, which Defendants suggest is evidence of manipulation.  ECF No. 80 at 16 ("The URL does not match counsel's representations.")  ECF No. 80-2, ¶ 2; *see* ECF No. 78-2 at 102.  The Court takes judicial notice that—at least when using the Google Chrome browser on a Windows computer, and in a displayed website or screenshot rather than a PDF printout—a URL in a shaded box in that bottom left position on the screen reflects the destination of a link that the user's cursor is hovering over, not the page currently displayed.  The screenshot on which the URL appears includes multiple Alastin products, in addition to products sold by the parties and others.  ECF No. 78-1 at 102.  The URL therefore does not appear to be evidence of manipulation.

[15] At the hearing, counsel for both sides represented that they stood by their declarations and would submit to depositions and testify at trial if necessary.

United States District Court
Northern District of California

credence to Mr. Kronenberger's Exhibit F, and without conceding there is any likelihood of confusion in this case, Defendants will consent to entry of summary judgment of no likelihood of confusion that includes a requirement that Defendants disable the Shop app listing option for as long as Plaintiff sells a skincare product on the Shop app." ECF No. 80-20, ¶ 4; *see also* ECF No. 80 at 14–15. But Defendants do not offer evidence that they have actually ceased using that platform. Defendants cite no authority permitting the Court either to consider such an offer of compromise in resolving a motion for summary judgment, or to impose injunctive relief in favor of a plaintiff when granting a defendant's motion.

### 3. Diana Wilson's Declaration

Defendants challenge Plaintiff's co-founder Diana Wilson's declaration as conclusory and self-serving. As Defendants note, the Ninth Circuit has at times cautioned against reliance on mere conclusory declarations offered by parties to defeat summary judgment. "A conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact." *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997). "When the nonmoving party relies only on its own affidavits to oppose summary judgment, it cannot rely on conclusory allegations unsupported by factual data to create an issue of material fact." *Hansen v. United States*, 7 F.3d 137, 138 (9th Cir. 1993) (per curiam).

The facts of those cases do not support as strong a reading of their holdings as Defendants advance here. In *Publisher's Clearing House*, the Ninth Circuit observed that the defendant's "affidavit filed in opposition to summary judgment made *no* mention of [the] facts" at issue, which appeared only in her appellate brief. 104 F.3d at 1171 (emphasis added). In *Hansen*, the Ninth Circuit held that the plaintiffs' declaration that they did not *receive* a particular notice did not create an issue of material fact to rebut the defendant's evidence that it *mailed* such notice—a different question for which the plaintiffs had no personal knowledge. 7 F.3d at 138. And in *Marks v. United States*, a case to which this line of reasoning traces back,[16] the Plaintiff appears to have offered no evidence beyond speculation to indicate that the Department of Justice had

---

[16] *See Hansen*, 7 F.3d at 138 (citing *United States v. 1 Parcel of Real Property*, 904 F.2d 487, 492 n.3 (9th Cir. 1990) (in turn citing *Marks v. United States*, 578 F.2d 261, 263 (9th Cir. 1978))).

United States District Court
Northern District of California

responsive documents that it failed to disclose under the Freedom of Information Act.  *Marks*, 578 F.2d 261 (1978).

District courts have applied this doctrine where evidence in a declaration could not carry a party's burden on a particular issue in dispute.  For example, in a case cited by Defendants, a party offered a declaration of its officer's "belief" that it was damaged by trademark infringement, which "mention[ed] instances of confusion" but "provide[d] no details as to who specifically was confused, when the instance occurred, or how many times that type of confusion occurred."  *Am. Auto. Ass'n of N. Cal, Nev. & Utah v. Gen. Motors LLC*, 367 F. Supp. 3d 1072, 1107 (N.D. Cal. 2019).  Judge Koh rightly held that declaration insufficient to show actual damages from trademark infringement and granted the defendant's motion for summary judgment as to that issue.  *Id.*[17]

Here, Defendants challenge Wilson's statements that "Plaintiff 'expended significant time, effort and financial resources in advertising and promoting its brand' and that Plaintiff's mark 'is well-known in California, the United States, and internationally, and enjoys substantial recognition, goodwill, and association with Saints & Sinners.'"  ECF No. 80 (Reply) at 18 (citing ECF No. 78-1 (Wilson Decl.) ¶¶ 12, 22).  The Court agrees that those statements, "lifted verbatim from the SAC," *see id.*, are too conclusory on their own to carry Plaintiff's burden on any issue in dispute, and does not rely on them.

In a short footnote, Defendants attack Wilson's references to Plaintiff's products receiving press coverage, as documented in screenshots of Plaintiff's website attached to her declaration. ECF No. 80 at 19 n.10 (citing ECF No. 78-1, ¶ 14).  The Court declines to disregard such evidence.  Coverage of Plaintiff's products is a matter likely within Wilson's personal knowledge. Crediting Wilson's unrebutted declaration that the screenshots accurately depict Plaintiff's press coverage, the Court presumes that Plaintiff could offer evidence at trial that (for example) some of its products won various beauty magazine awards or were mentioned on morning television programs.  *See* ECF No. 78-1, ¶ 14 & Ex. F; *see also Fraser*, 342 F.3d at 1036 (holding that it was

---

[17] Defendants have not sought summary judgment here on such discrete questions of what relief might be available if Plaintiff prevails on its claims.

not necessary to resolve whether a diary offered on summary judgment was inadmissible hearsay because the party who wrote it could testify to the facts recounted therein or present them in other ways at trial).

Defendants also challenge Wilson's declaration to the extent it discusses Plaintiff's plans to expand into the skincare market.  Defendants fault Wilson for failing to identify specific suppliers or forthcoming products, and for a lack of supporting evidence.  ECF No. 80 at 19–20.  As discussed above in the context of Defendants' Motion to Dismiss, Wilson states that Plaintiff has been preparing to enter the skincare market since 2019, completed initial formulation of its first skincare product in August of 2024, "commissioned a third-party stability report" in October 2024, has worked with a manufacturer for more than two years and placed its first purchase order in September of this year, anticipated a product photoshoot in November, and scheduled the launch of its first skincare product in December.  ECF No. 78-1, ¶¶ 18–36.  These are non-speculative statements of matters within Wilson's personal knowledge.  As such, the Court declines to disregard them in considering Defendants' Motion for Summary Judgment.

Understandably, Defendants would like more details.  But that is what discovery is for.  Wilson asserts that Plaintiff has produced documents in discovery regarding its development of skincare products but declined to file them in the record to preserve trade secrets.  ECF No. 78-1, ¶ 37.  That approach does not aid the Court in its task of evaluating the record.  Plaintiff could, and probably should, have sought to file such evidence under seal.  But Defendants have Plaintiff's document productions and could have taken further discovery if they wished, yet offer no evidence rebutting Wilson's statements regarding Plaintiff's product expansion plans or distinguishing the forthcoming first skincare product as irrelevant to Plaintiff's claims.  Wilson's declaration has limitations, including its failure to identify which product Plaintiff intended to launch in December.  As far as it goes, however, the Court declines to exclude it as too conclusory to consider on summary judgment.

### D.    Analysis

Claims under the Lanham Act for trademark infringement and unfair competition, as well as related state law claims, generally require a plaintiff to show a "likelihood of consumer

confusion" due to similarities between competing marks. *JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1105 (9th Cir. 2016). "To constitute trademark infringement, use of a mark must be likely to confuse an *appreciable* number of people as to the source of the product." *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1151 (9th Cir. 2002). As with their previous motion to dismiss the First Amended Complaint, Defendants move for summary judgment on Plaintiff's trademark and unfair competition claims solely for failure to show likelihood of confusion. ECF No. 50 at 9–12.

> To determine whether a likelihood of consumer confusion exists, our court relies on the eight-factor *Sleekcraft* test, which reviews: (1) the strength of the mark; (2) proximity or relatedness of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) the defendant's intent in selecting the mark; and (8) the likelihood of expansion of the product lines. The factors are non-exhaustive and applied flexibly; the *Sleekcraft* factors are not intended to be a rote checklist. A determination may rest on only those factors that are most pertinent to the particular case before the court, and other variables besides the enumerated factors should also be taken into account based on the particular circumstances.

*JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1106 (9th Cir. 2016) (cleaned up); *see also, e.g.*, *Doctor's Best, Inc. v. Nature's Way Prods., LLC*, 143 F.4th 1101, 1107 (9th Cir. 2025); *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 & n.11 (9th Cir. 1979).

The parties dispute how that standard applies on summary judgment. Plaintiff asserts that "the appropriate standard . . . is whether Plaintiff can raise a material question of fact as to whether the relevant segment of the buying public *might* confuse Plaintiff's products with Defendants', or vice versa." ECF No. 78 at 15 (emphasis added). Defendants contend Plaintiff must produce evidence sufficient to show *likely* confusion. ECF No. 80 at 8–9. The case on which Plaintiff relies makes clear that Defendants' briefing on this point is correct.[18] In affirming summary judgment, the Ninth Circuit stated that the plaintiff failed to "show sufficient evidence to permit a rational trier of fact to find that confusion is '*probable*,' not merely 'possible.'" *M2 Software, Inc.*

---

[18] At the hearing, however, defense counsel invited the Court to "say, 'yes, they're arguing this and that, but I've looked at it and I don't think confusion is probable.'" *That* framing is no more correct than Plaintiff's. The Court's task on summary judgment is not to decide on its own whether confusion is likely, but to decide whether a reasonable jury could reach that conclusion.

*v. Madacy Ent.*, 421 F.3d 1073, 1085 (9th Cir. 2005) (emphasis added).[19]  So too here: Plaintiff must offer evidence from which a reasonable jury could conclude that confusion is likely to occur, not merely possible to occur.  Plaintiff's use of the word "might" diverges from the Ninth Circuit's standard requiring evidence sufficient to show probable confusion.  On the other hand, however, Plaintiff need not show that it is *likely* to prevail at trial.  If it is *possible* for a reasonable jury to find such a *likelihood* of confusion given the record evidence, that is sufficient to avoid summary judgment.

"Because the [likelihood of confusion] determination is based on a non-exhaustive, multi-factor, fact-intensive inquiry," the Ninth Circuit has "cautioned against granting summary judgment in these cases."  *JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1105 (9th Cir. 2016).  "Granting summary judgment in cases in which a majority of the *Sleekcraft* factors could tip in either direction is inconsistent with that principle."  *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1039 (9th Cir. 2010).  If the "evidence supporting most of [the *Sleekcraft*] factors is evenly matched or tips only slightly in favor of either party," granting summary judgment is error that warrants reversal on appeal.  *BBK Tobacco & Foods LLP v. Cent. Coast Agric., Inc.*, No. 22-16190, 2024 WL 1364300, at *1 (9th Cir. Apr. 1, 2024).

### 1.    Strength of Marks

"The more likely a mark is to be remembered and associated in the public mind with the mark's owner, the greater protection the mark is accorded by trademark laws.  This 'strength' of the trademark is evaluated in terms of its conceptual strength and commercial strength."  *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1207 (9th Cir. 2000) (citations omitted).

---

[19] Plaintiff relies on a perhaps inartful statement in *M2* that "to survive summary judgment on its forward confusion claim in this case, M2 Software must raise a material question of fact whether the general public and the music industry members thought that M2 Software was the source of Madacy's CDs."  *M2*, 421 F.3d 1073, 1079–80.  Taken alone, that sentence would seem to suggest a requirement to establish at least a material question of fact as to whether *actual* (as opposed to likely) confusion occurred, which is not the law.  The Ninth Circuit has made clear that actual confusion is not a necessary element of a trademark claim.  *See, e.g.*, *La Quinta Worldwide LLC v. Q.R.T.M., S.A. de C.V.*, 762 F.3d 867, 876 (9th Cir. 2014).

United States District Court
Northern District of California

### a.    Forward Confusion: Plaintiff's Strength

For a "forward confusion" theory of infringement—where a plaintiff claims that customers will mistake the defendant's product for the plaintiff's, thus allowing the defendant to trade on the plaintiff's reputation—this factor focuses on the conceptual and commercial strength of the plaintiff's mark. *See, e.g.*, *GoTo.com*, 202 F.3d at 1207.

Conceptual strength looks to the nature of the mark and the degree to which it merely describes the products being sold. Unique, distinctive, and "arbitrary" or "fanciful" marks are considered stronger than generic or descriptive marks, with "suggestive" marks falling somewhere in between. *Entrepreneur Media*, 279 F.3d at 1141.

As discussed in the Court's previous Order, both parties' double-S marks are not descriptive of the products being sold. ECF No. 60 at 7. There is no substantive connection between two stylized instances of the letter S and haircare or skincare products. As Defendants concede, "Plaintiff's double S logo is arbitrary and fanciful with respect to hair care products because it has no intrinsic connection to the product when used." ECF No. 67 at 18. The marks' non-descriptive nature tends to weigh in favor of their conceptual strength and a likelihood of confusion. *Entrepreneur Media*, 279 F.3d at 1141.

"Commercial strength is based on actual marketplace recognition, and thus advertising expenditures can transform a suggestive mark into a strong mark." *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1149 (9th Cir. 2011) (citation and internal quotation marks omitted). As discussed above in the context of Defendants' objections to Wilson's declaration, Plaintiff has offered at least some evidence that its products (and associated mark) have been featured in beauty publications and on morning television programs. *See* ECF No. 78-1, ¶ 14 & Ex. H. Such exposure supports at least some degree of commercial strength.

"'Incontestable' trademarks—those that have not been successfully challenged within five years of registration, *see* 15 U.S.C. § 1065—are presumed to be strong marks." *AutoZone, Inc. v. Tandy Corp.*, 373 F.3d 786, 794 (6th Cir. 2004); *see also San Diego Comic Convention v. Dan Farr Prods.*, 336 F. Supp. 3d 1172, 1186 (S.D. Cal. 2018) (quoting *AutoZone*). Plaintiff's mark is incontestable (within the meaning of that statute), thus lending further support to its strength. ECF

33

1   No. 78-1, ¶¶ 9–11 & Exs. C, D.

2       There is some evidence of other similar marks in the relevant markets.  *See* ECF No. 67 at

3   13–16 (discussing evidence previously offered for judicial notice).  But that "is an 'offsetting

4   consideration[]' that tends to negate the value of an otherwise strong mark; it does not necessarily

5   invert this factor to weigh *against* confusion."  ECF No. 60 at 7 (quoting *One Indus., LLC v. Jim*

6   *O'Neal Distrib., Inc.*, 578 F.3d 1154, 1165 (9th Cir. 2009)) (alteration in original).

7       Taken as a whole, and viewing the record in the light most favorable to Plaintiff, this factor

8   weighs in favor of a likelihood of confusion on a forward confusion theory, as Defendants

9   essentially concede.  *See* ECF No. 80 at 20 (characterizing this factor as "Neutral or slightly favors

10  Plaintiff").

11              **b.      Reverse Confusion: Defendants' Strength**

12      For a theory of "reverse confusion"—that customers will mistakenly believe the plaintiff's

13  products are associated with the defendant—"the inquiry focuses on the strength of the

14  [defendant's] junior mark because the issue is whether the junior mark is so strong as to overtake

15  the [plaintiff's] senior mark."  *Walter v. Mattel, Inc.*, 210 F.3d 1108, 1111 (9th Cir. 2000).  The

16  strength of the plaintiff's mark also remains relevant "to determine the scope of trademark

17  protection to which the mark is entitled."  *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625,

18  631 n.3 (9th Cir. 2005).  But the emphasis is on the defendant's mark, and particularly its

19  *commercial* strength, because a plaintiff must ultimately show that its public recognition risks

20  being overtaken by the defendant.  *See Cohn v. Petsmart, Inc.*, 281 F.3d 837, 841 (9th Cir. 2002).

21      Here, Plaintiff all but ignores that requirement.  In response to Defendants' arguments

22  regarding reverse confusion and their lack of commercial strength, Plaintiff simply asserts that it is

23  not "solely concerned with reverse confusion" but instead "*more* concerned with forward

24  confusion."  ECF No. 78 at 16.  The record perhaps reflects some degree of Defendants'

25  commercial strength in that they have advertised their products through local and national media.

26  ECF No. 67-19 at 33–34 (Cutler Dep. at 59:5–60:24).  But that alone does not suggest Defendants

27  have the "ability to overwhelm any public recognition and goodwill that [Plaintiff] has developed

28  in [its] mark."  *See Cohn*, 281 F.3d at 841.  Defendants' relatively modest sales—at least on the

United States District Court
Northern District of California

34

scale of the national skincare or beauty market as a whole—undermine any implication that

Defendants pose a serious risk of dominating the public's perception of the market.  *See* ECF No.

66-6 (provisionally under seal).  Plaintiff does not address the strength of Defendants' mark in any

way.  *See* ECF No. 78 at 15–16 (addressing the strength-of-mark factor under the heading

"Plaintiff's mark is strong and distinctive").

The Court therefore concludes that this factor weighs strongly against a likelihood of

reverse confusion.  In conjunction with the factors below, which do not overwhelmingly favor

Plaintiff's position, the nearly complete absence of evidence of commercial strength of

Defendants' mark warrants summary judgment on Plaintiff's reverse confusion theory.

### 2.    Relatedness of Goods

As the Court previously held, a "plaintiff 'need not establish that the parties are direct

competitors to satisfy the proximity or relatedness factor.  Related goods (or services) are those

which would be reasonably thought by the buying public to come from the same source *if* sold

under the same mark.'"  ECF No. 60 at 8 (quoting *Rearden LLC v. Rearden Com., Inc.*, 683 F.3d

1190, 1212 (9th Cir. 2012), cleaned up with emphasis added).[20]

Plaintiff's expert Young offers unrebutted opinion evidence of a trend involving "ongoing

expansions of skincare brands into haircare and unified brand strategies across both categories."

ECF No. 78-3, ¶ 9.  As discussed above, the Court declines to exclude such evidence.  Viewing

the record in the light most favorable to Plaintiff, that trend supports a reasonable inference that

consumers might expect brands offering skincare or haircare products to sell products in both of

those categories (or at least would not be surprised to see them doing so), and thus might conflate

similar trademarks used across the two categories.

Defendants concede "that there are businesses that offer both hair care and skin care

products," but argue that Plaintiff has not identified evidence of such crossover in the market for

"medical grade skin care products in connection with medical spa service offerings."  ECF No. 67

at 20–21.  Such distinctions might be relevant at trial, but Defendants have not offered evidence in

---

[20] The analysis here thus differs from this Order's discussion of direct competition for the purpose
of Plaintiff's false advertising claims.

the current record to show that consumers place significant weight on them when buying the products at issue. Nor have they countered Young's opinion evidence that the "term 'medical grade' has no recognized meaning within the skincare industry." ECF No. 78-3, ¶ 6.

Plaintiff's planned expansion into the skincare market, as described in Wilson's declaration, also supports a finding of relatedness. ECF No. 78-1, ¶¶ 28–38. This factor might carry more weight if Wilson had described specific forthcoming products and addressed how they compare to Defendants' offerings. But Wilson's declaration is evidence of at least *some* impending entry by Plaintiff into skincare. Even if Plaintiff's forthcoming skincare products are not direct counterparts to Defendants' products, a jury could reasonably conclude that they might be "thought by the buying public to come from the same source if sold under the same mark." *Rearden*, 683 F.3d at 1212.

A finder of fact viewing the current record in the light most favorable to Plaintiff thus could reasonably find that the relatedness-of-goods factor favors a likelihood of confusion.

### 3. Similarity of Marks

"Obviously, the greater the similarity between the two marks at issue, the greater the likelihood of confusion." *Entrepreneur Media*, 279 F.3d at 1144 (citation omitted). The Ninth Circuit has "developed three axioms that apply to the 'similarity' analysis: 1) Marks should be considered in their entirety and as they appear in the marketplace; 2) Similarity is best adjudged by appearance, sound, and meaning; and, 3) Similarities weigh more heavily than differences." *Id.*

As the Court previously noted, the parties' "marks have meaningful differences, such that someone comparing them side by side would never consider them to be the same mark." ECF No. 60 at 9. Plaintiff does not dispute that characterization. ECF No. 78 at 19. The apparent difference between the parties' marks—with Plaintiff's on the left and Defendants' on the right below—remains a challenge to Plaintiff's claims.

 

Defendants again rely on the Ninth Circuit's decision in *One Industries, LLC v. Jim*

*O'Neal Distribution, Inc.*, where the panel affirmed summary judgment for the defense based in large part on a lack of similarity between two marks that both consisted of a stylized letter O, both used for the sale of directly competing motorcycle products.  578 F.3d at 1162–63.  Like here, the marks in that case had noticeable differences: one was a rounded letter O followed by an apostrophe, and the other was a disconnected O created by "two angular symbols . . . placed in such a way that a 'Z'-shaped space appears between the two."  *Id.* at 1163 (ellipsis in original). *One Industries* is likely Defendants' best case for granting summary judgment, and perhaps renders the present motion a close call.

But there are also some significant similarities between the parties' marks and how they appear in the marketplace.  Both parties use monochrome double-S marks.  Both employ minimalist design on their product packaging that prominently displays the respective mark, trade name, and product title, arranged vertically on most products with little if any other information or graphics.  *Compare, e.g.*, ECF No. 67-20 at 3, 4, 6 (several of Defendants' products) *with* ECF No. 78-1 at 18–19 (several of Plaintiff's products).  Defendants' previous mark, featuring the name "THE SKIN SAINT" with a halo over the first letter "N" and often two different colors of text, is visually more distinct from both parties' current marks and trade dress than they are from each other.  *See* ECF No. 67-19 at 49–50.  Plaintiff also raises subjective questions of whether the current marks themselves, and the parties' websites where they appear, reflect similar aesthetic sensibilities beyond minimalism.  *See, e.g.*, ECF No. 78 at 10 (asserting shared "moody, gothic" styling).  Such questions, on which reasonable minds might differ, are not suitable for resolution on summary judgment.

Both parties also use their marks in conjunction with alliterative trade names that feature the word "Saint" or "Saints."[21]  The *One Industries* case did not involve similar trade names.

---

[21] Defendants argue that the parties' trade names are themselves distinctive, but these are quintessentially arguments for trial, as should be clear from the following passage in Defendants' Motion:

> The differences in connotation of the parties' brand names are self-evident and important.  Plaintiff's SAINTS & SINNERS mark is a unitary phrase with theological and moral underpinnings juxtaposing good and bad, right and wrong. It is a well-established, common phrase used for centuries to express concepts of human nature.  It is a three-word phrase that cannot be dissected, and consumers

Even though the parties' marks can be readily distinguished when compared side by side, they are far more similar than in some cases where courts have granted summary judgment. In *Blue Bottle*, for example, Judge Breyer granted summary judgment in large part because the parties' marks did "not look anything alike when encountered in the marketplace." *Blue Bottle Coffee, LLC v. Liao*, No. 21-cv-06083-CRB, 2024 WL 2061259, at *13 (N.D. Cal. Dec. 5, 2024). The plaintiff's BLUE BOTTLE mark had a "clean and minimalist aesthetic," with block letters "in close proximity to a solid blue bottle that is centered on the product." *Id.* In contrast, Defendants' "much busier" BLUE BREW mark included "a large and elaborate letter B, with the top evocative of a mountain range, and the remaining letters in cursive," partially overlapping "a somewhat garish, dark blue cornflower" on product packaging. *Id.* Images included in Judge Breyer's Order support his conclusion that the marks and trade dress where they appeared were distinctly different. *Id.*

The marks here are more stylistically and structurally similar, and a finder of fact might also reasonably consider both parties' use of the word "saint" in their trade names here to be a more conspicuous similarity than both parties' use of the far more common word "blue" in *Blue Bottle*. The marks here are also more similar than in *BBK Tobacco*, and even despite the distinct differences between the marks in that case, the Ninth Circuit held that the district court erred in granting summary judgment for a defendant. *See* 2024 WL 1364300, at *3 (Bumatay, J., dissenting based on his view that the "two marks look nothing alike").

On the previous Motion to Dismiss, the Court held it "at least conceivable that a consumer might remember, or perhaps describe to a friend, an experience with a beauty product with a double-S logo and a name that includes 'Saint,' leading a consumer to confuse the parties'

---

will perceive the phrase as a unitary one and will not parse the words, given the phrase's well-established meaning and pervasive use. In contrast, Defendant's SKIN SAINT mark is a newly coined phrase, which uses the word "saint" for its ordinary meaning of a person who does good deeds. In this case Ms. Cutler's success at skin treatments is reflected in the connotation of the phrase SKIN SAINT, which also is an unusual pairing of two words not normally found together, thereby creating a distinctive and memorable overall commercial impression that is different from, and not likely to be confused with, the oft-used phrase SAINTS & SINNERS

ECF No. 67 at 21–22.

United States District Court
Northern District of California

products when considering a subsequent purchase." ECF No. 60 at 9. The current record does not meaningfully alter that conclusion. The Ninth Circuit has also recognized that "the fact that a consumer would likely notice the difference between two marks" does not always "suffice for a finding that the marks are dissimilar," at least where the plaintiff's mark is strong. *Entrepreneur Media*, 279 F.3d at 1145 n.9.

The Court once again weighs similarities "more heavily than differences," *id.* at 1144, views the record in the light most favorable to Plaintiff, and takes into account the Ninth Circuit's "caution[] against granting summary judgment in these cases," *JL Beverage*, 828 F.3d at 1105. Once again, the Court concludes that the differences between the parties' marks do not compel a decision for Defendants. Viewing the record in the light most favorable to Plaintiff, a finder of fact could reasonably conclude that the similarities between the marks, in conjunction with similarities of trade names and trade dress where the marks appear in commerce, favor a likelihood of confusion.

### 4.    Evidence of Actual Confusion

For as long as courts have considered the *Sleekcraft* factors, they have recognized that *actual* confusion is strong evidence of likely future confusion, but the absence of such evidence is not dispositive. "Consequently, this factor is weighed heavily only when there is evidence of past confusion or, perhaps, when the particular circumstances indicate such evidence should have been available." *Sleekcraft*, 599 F.2d at 353.

Defendants ask the Court to draw an adverse inference that because Plaintiff has not offered a survey, the evidence that might have been obtained through such a survey would show that consumers are not actually confused by the marks. ECF No. 80 at 9–10. The cases they cite from this district were not decided on a posture of summary judgment. *Novadaq Techs. v. Karl Storz GMBH & Co. K.G.*, No. 14-cv-04853-PSG, 2015 U.S. Dist. LEXIS 170423, at *11 (N.D. Cal. Dec. 18, 2015) (permitting a party at trial to "elicit[] evidence that [its opponent] did not conduct a trademark survey," because "a trier of fact may be entitled to presume that one party's failure to conduct a survey concedes that the survey evidence would be unfavorable to it" (citation omitted); *BillFloat Inc. v. Collins Cash Inc.*, No. 20-cv-09325-EMC, 2023 U.S. Dist. LEXIS

39

34318, at *8 (N.D. Cal. Mar. 1, 2023) (addressing that principle in denying a motion for a new trial); *Instant Media, Inc. v. Microsoft Corp.*, No. C 07-02639 SBA, 2007 U.S. Dist. LEXIS 61443, at *42 (N.D. Cal. Aug. 13, 2007) (considering such inferences in the context of a motion for a preliminary injunction, where the court may properly weigh competing evidence). In the summary judgment context, however, one party's lack of survey evidence is not dispositive, even when faced with adverse survey evidence offered by an opponent—which Defendants have not offered here. *Monster, Inc. v. Dolby Labs. Licensing Corp.*, 920 F. Supp. 2d 1066, 1072 (N.D. Cal. 2013).

Even if a lack of survey evidence might permit the finder of fact to presume at trial that the results would be unfavorable, "whether a presumption has been overcome is normally a question for the jury." *Gessele v. Jack in the Box Inc.*, 160 F.4th 1011, 1027 (9th Cir. 2025) (quoting *Lynd v. Rockwell Mfg. Co.*, 276 Or. 341, 346 (1976) (en banc)) (cleaned up). The Ninth Circuit's decision in *Gessele* did not address trademark infringement and quoted *Lynd* for its statement of Oregon law, but this Court finds the general principle sound and persuasive in considering the significance of legal presumptions on summary judgment. *See also O'Neil v. City & County of San Francisco*, No. 17-cv-07190-JCS, 2021 WL 2914975, at *11 n.12 (N.D. Cal. July 12, 2021) ("[A]pplying a merely *permissible* adverse inference against [a non-moving party] would contravene the requirement to draw all reasonable inferences in *his* favor.").

This Court declines to follow other courts that have drawn an adverse inference based on the non-moving party's lack of survey evidence in resolving a motion for summary judgment. *Cf., e.g.*, *Network Automation, Inc. v. Hewlett-Packard Co.*, No. CV 08-4675-JFW (RZx), 2009 U.S. Dist. LEXIS 125835, at *29 (C.D. Cal. Sep. 14, 2009). Though a lack of evidence may be relevant to whether a plaintiff can meet its burden at trial, drawing an adverse inference at this stage as to what such evidence could be expected to show would violate the rule that courts must view the facts in the light most favorable to the non-moving party. *O'Neil*, 2021 WL 2914975, at *11 n.12. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

40

255 (1986).  Defendants offer no evidence that consumers familiar with both parties' marks and products are *not* confused by them.  *Cf. Blue Bottle*, 2024 WL 2061259, at *16–18 (granting summary judgment where the defendants offered methodologically sound survey evidence showing "virtually no likelihood of confusion" and the plaintiff offered no such evidence of actual or likely confusion).

Accordingly, there remains simply an absence of evidence of actual confusion.  As stated in the Court's previous Order, a "failure to *prove* instances of actual confusion is *not* dispositive against a trademark plaintiff, because actual confusion is hard to prove; difficulties in gathering evidence of actual confusion make its absence generally unnoteworthy."  ECF No. 60 at 10 (quoting *Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.*, 174 F.3d 1036, 1050 (9th Cir. 1999)).

In some cases where actual confusion might be expected if marks are in fact overly similar, like when parties have been in direct local competition over a period of several years, the absence of actual confusion may become more relevant, though whether a party would be expected to be able to *prove* such confusion remains a consideration.  *See id.* (discussing *Cohn v. Petsmart, Inc.*, 281 F.3d 837, 842 (9th Cir. 2002)).  Here, though, the parties are only now entering a new phase of more direct competition as Plaintiff prepares to enter the skincare market.  When "sales of [a directly competing product] have been minimal . . . [i]t would be unfair to penalize [a party] for acting to protect its trademark rights before serious damage has occurred."  *Lois Sportswear, U.S.A. v. Levi Strauss & Co.*, 799 F.2d 867, 875 (2d Cir. 1986).  The Court is therefore unwilling to hold as a matter of summary judgment that a lack of evidence of actual confusion precludes a finding at trial of a *likelihood* of confusion.

As discussed in the Court's previous Order, the Ninth Circuit has "found a party's *concession* that no confusion occurred during years of coexistence to carry significant weight," while distinguishing such an explicit concession from a mere absence of evidence of confusion.  ECF No. 60 at 10 (citing *Brookfield*, 174 F.3d at 1050).  Citing no evidence, Defendants characterize Plaintiff's answers to requests for admission as "conceding there have been no instances of actual confusion" in this case.  ECF No. 67 at 22.  Defendants' own summary of Plaintiff's admissions, however, only discusses Plaintiff's *lack of knowledge* of actual confusion,

such as an absence of customer complaints or mistaken inquiries. ECF No. 67 at 10; *see* ECF No. 67-2 at 9–12 (RFAs 6–12). Taking into account both *Brookfield*'s and this Court's previous Order's clear distinction between a lack of knowledge of actual confusion and a concession that no confusion occurred, the Court finds Defendants' conflation of the two unhelpful. If Plaintiff had conceded that no consumer had ever confused the parties' marks or products that might be a different story—though the fact that the parties are only now beginning to compete more directly might undercut the significance of even that concession. But Plaintiff has made no such concession. It remains possible that consumers have confused the two marks, and either purchased or declined to purchase products based on that mistake, without alerting either party to their having done so.

Viewing the record in the light most favorable to Plaintiff, this factor weighs at most slightly against a likelihood of confusion.

### 5. Marketing Channels

"When examining the marketing channels used by the competing companies, [courts] consider where the goods or services are sold, the sales and marketing methods employed, and the class of purchasers exposed to the marketing efforts." *La Quinta Worldwide LLC v. Q.R.T.M., S.A. de C.V.*, 762 F.3d 867, 876–77 (9th Cir. 2014).

The Court previously found that this factor did not "weigh[] meaningfully in favor of Defendants" when both parties market their products in part through social media and through their websites, which Plaintiff contends are stylistically similar. ECF No. 60 at 10–11. The current record, though not markedly different from the pleadings that the Court previously addressed, indicates that the parties share at least some marketing channels.

Defendants offer evidence that they primarily sell their product through their physical location in Michigan.[22] But that does not negate their sales through other platforms that are more

---

[22] Plaintiff's assertion that Defendants' "sell and market their Skin Saint products primarily through their own website and social media accounts," ECF No. 78 at 22, is not supported by evidence. That assertion appears to be contrary to the record of Defendants' far greater sales through their physical spa location, at least when prescription products bearing their mark at issue are included in the analysis. *See* ECF No. 67-1, Ex T (filed under seal as ECF No. 66-6).

42

United States District Court
Northern District of California

United States District Court
Northern District of California

likely to overlap with Plaintiff's products and customers. If Defendants' online sales included customers who would otherwise have purchased Plaintiff's products, it would be cold comfort to Plaintiff that Defendants had also sold more of their products to other customers at their clinic. Defendants have not argued that their internet sales are so small in absolute terms as to not include "an *appreciable* number of people." *Cf. Entrepreneur Media*, 279 F.3d at 1151.

Both parties use Instagram, among other social media platforms, to market their products. ECF No. 67-19 at 33 (Cutler Dep. at 59:5–19); ECF No. 78-1, ¶ 15 & Ex. G; ECF No. 78-2, ¶ 13 & Ex. I. As ubiquitous as those platforms may be, that does not warrant *wholly* discounting parties' shared use of them when considering sales and marketing channels. A user with an interest in beauty products on Instagram might be exposed to both parties' products through the parties' posts or accounts linking to the parties' websites (which Plaintiff asserts have a similar appearance), from which the user can then purchase a product. A consumer who encountered Plaintiff's product at the top of her Instagram feed one day, and perhaps purchased that product and liked it, might encounter Defendants' products at the top of her feed another day. That opportunity for exposure to both products in the same context distinguishes a platform like Instagram from cases the Court previously cited where the Ninth Circuit has held that parties merely having both "advertise[d] on the internet" does not favor a likelihood of confusion. ECF No. 60 at 11 (citing *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1151 (9th Cir. 2011); *Playboy Enters., Inc. v. Netscape Commc'ns Corp.*, 354 F.3d 1020, 1028 (9th Cir. 2004)). The degree to which such a consumer might reasonably be expected to remain confused throughout that Instagram-to-website purchasing process is a matter best addressed by a jury.

Plaintiff has also now offered evidence that both parties' products are available through the Shop.app interface and—viewing the record in the light most favorable to Plaintiff—that they may be found in some of the same search results for Plaintiff's trade name and skincare. ECF No. 78-2, ¶ 10 & Ex. F. At the hearing, defense counsel characterized the Shop.app platform as "very obscure," but there is no record evidence to support that assertion beyond Defendants' own small volume of sales through that platform. That defense counsel had not previously heard of that

United States District Court
Northern District of California

1   platform is of no evidentiary consequence.  (Plaintiff's counsel's characterization at the hearing of

2   Shop.app as a "juggernaut" is similarly unsupported.)  And as noted above, Defendants have also

3   volunteered to cease selling products through Shop.app or to accept "a requirement that [they]

4   disable the Shop app listing option" if that would affect the Court's analysis, but they cite no

5   authority suggesting that a court may grant summary judgment for a party based on that party's

6   offer to change its own behavior or consent to injunctive relief against it.  *See* ECF No. 80 at 14–

7   15; ECF No. 80-20, ¶ 4.  Defendants' evidence that their sales through Shop.app are negligible

8   carries more weight, *see* ECF No. 80-20, ¶ 4, but does not entirely negate this overlapping sales

9   channel.

10        This is a case with some, but limited, overlap in the parties' sales and marketing channels.

11   The potential for customers to encounter the parties' products on some of the same platforms

12   weighs against granting summary judgment, albeit not particularly strongly.

13                    **6.    Type of Goods and Degree of Care**

14        As the Court previously noted, "Courts consider the type of good in determining the degree

15   of care that a reasonable consumer would be expected to exercise, which in turn informs the

16   underlying question of the likelihood of confusion."  ECF No. 60 at 11.

17                 Likelihood of confusion is determined on the basis of a reasonably
                   prudent consumer. What is expected of this reasonably prudent
18                 consumer depends on the circumstances. We expect him to be more
                   discerning—and less easily confused—when he is purchasing
19                 expensive items, *see, e.g., Official Airline Guides* [*Inc. v. Goss*, 6 F.3d
                   1385, 1393 (9th Cir. 1993)] (noting that confusion was unlikely
20                 among advertisers when the products in question cost from $2,400 to
                   $16,000), and when the products being sold are marketed primarily to
21                 expert buyers. We recognize, however, that confusion may often be
                   likely even in the case of expensive goods sold to discerning
22                 customers. On the other hand, when dealing with inexpensive
                   products, customers are likely to exercise less care, thus making
23                 confusion more likely. *See, e.g.,* [*E. & J. Gallo Winery v. Gallo Cattle
                   Co.*, 967 F.2d 1280, 1293 (9th Cir. 1992)] (wine and cheese).
24

25   *Brookfield*, 174 F.3d at 1060 (cleaned up).  "[T]he standard of care to be exercised by the

26   reasonably prudent purchaser will be equal to that of the least sophisticated consumer."

27   *GoTo.com*, 202 F.3d at 1209 (quoting *Ford Motor Co. v. Summit Motor Prods., Inc.,* 930 F.2d

28   277, 293 (3d Cir. 1991)).

                                          44

United States District Court
Northern District of California

Plaintiff offers opinion evidence from its expert witness Young that the beauty industry has seen a shift towards more impulse purchases based on names, logos, and iconography, as social media has become a more prevalent marketing channel.  ECF No. 78-3, ¶¶ 10–13.  Young states that is particularly true for lower-priced products in the range of $20 to $45.  *Id.* ¶ 12.  Though not all of the parties' products fall in the price range that Young addressed specifically, some of them do.  *See, e.g.*, ECF No. 78-2 at 104, 107 (two of Defendants' products listed for $45 each).  The parties' prices certainly do not approach the multi-thousand-dollar products at issue in *Official Airline Guides*, 6 F.3d at 1393.

Defendants dispute the relevance of Young's opinions when Defendants do not sell their products directly through social media.  Viewing the evidence in the light most favorable to Plaintiff, however, Young's declaration describes a market trend involving reduced consumer discernment that tends to favor a likelihood of confusion, even if Defendants' customers are not using the precise channels of commerce that led to the growth of that trend.

Defendants might, of course, be able to offer competing expert opinion evidence to the contrary.  But they have not done so yet.  Even if they had, any such conflicts would require resolution at trial.  Defendants' citation to statements by Wilson, Young, and one of the articles Young cites regarding consumer sophistication are similarly grounds for cross-examination, not summary judgment.  *See* ECF No. 67 at 10 (citing a statement by Wilson previously listed on Plaintiff's website, as confirmed through requests for admission); ECF No. 80 at 15 (citing ECF No. 80-17 at 5 (Young); ECF No. 78-3 at 50 (article offered by Young)).

As in their previous Motion to Dismiss, Defendants rely on statements in caselaw regarding the degree of care exercised by internet shoppers and consumers of cosmetics.  *See* ECF No. 67 at 24–25; ECF No. 80 at 14.  This Court remains of the view that such issues are better addressed on a factual record, particularly now that Plaintiff has offered expert opinion evidence of a trend towards impulse buying.  Outside of doctrines of estoppel that Defendants have not invoked, this Court is bound and informed by prior decisions on issues of law, not facts.  Defendants emphasize that some such cases were based on evidentiary records at trial.  ECF No. 67 at 24 (citing, *e.g.*, *Ben. Cosmetics LLC v. e.l.f. Cosmetics, Inc.*, 2024 U.S. Dist. LEXIS 228112

(N.D. Cal. Dec. 17, 2024)). But that only underscores the fact-based nature of the inquiry, and the need for Defendants to present their own evidence here. "[T]he difficulty of trying to determine with any degree of confidence the level of sophistication of [a particular category of consumers] only confirms the need for this case to be heard by a jury." *Fortune Dynamic*, 618 F.3d at 1038.

Viewing the current evidentiary record in the light most favorable to Plaintiff, the consumer care factor weighs in favor of a likelihood of confusion.

### 7.    Defendants' Intent

"When the alleged infringer knowingly adopts a mark similar to another's, reviewing courts presume that the defendant can accomplish his purpose: that is, that the public will be deceived." *Sleekcraft*, 599 F.2d at 354. In forward confusion cases, courts "ask whether defendant in adopting its mark intended to capitalize on plaintiff's good will." *Marketquest Grp., Inc. v. BIC Corp.*, 862 F.3d 927, 934 (9th Cir. 2017). But where there is no such evidence of intent to copy, the Ninth Circuit has "emphasized the minimal importance of the intent factor: 'Importantly, an intent to confuse customers is not required for a finding of trademark infringement.'" *GoTo.com*, 202 F.3d at 1208 (quoting *Brookfield,* 174 F.3d at 1059); *see also Marketquest*, 862 F.3d at 934.

The Court previously identified no allegation by Plaintiff that Defendants intended to copy their mark. ECF No. 60 at 13. There remains no evidence of such intent in the present record. But as the Court previously held, Defendants' lack of intent to copy Plaintiff's mark "sheds little light on the ultimate question of whether *consumers* are likely to be confused.'" *Id.* This factor does not weigh in favor of either party.

### 8.    Likelihood of Expansion of Product Lines

"A strong likelihood that either party may expand his business to compete with the other favors a finding of infringement." *Off. Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1394 (9th Cir. 1993). This factor overlaps to some degree with relatedness of goods. As discussed above, there is evidence both that Plaintiff has concrete plans to enter the skincare market in the coming months, ECF No. 78-1 (Wilson Decl.) ¶¶ 28–36, and that such crossover between haircare and skincare is a natural area of expansion in the current market for beauty products, ECF No. 78-3

46

1     (Young Decl.) ¶ 8.  This factor favors a likelihood of confusion, because the risk of consumers

2     conflating the two marks will increase when both parties are actively selling skincare products.

3                                                 *  *  *

4              Taking a wholistic view of the record and the *Sleekcraft* factors, it is far from clear that a

5     jury would find a likelihood of confusion between the parties' marks.  But whether Plaintiff will or

6     is likely to ultimately prevail is not the test on summary judgment, and the subjective questions at

7     issue are particularly difficult to resolve in this procedural posture.  *See Fortune Dynamic*, 618

8     F.3d at 1031 ("We are far from certain that consumers were likely to be confused as to the source

9     of Victoria's Secret's pink tank top, but we are confident that the question is close enough that it

10    should be answered as a matter of fact by a jury, not as a matter of law by a court.").  Viewing the

11    record in the light most favorable to Plaintiff, the Court cannot say that no reasonable jury would

12    be able to find a likelihood of confusion.

13             Defendants' Motion for Summary Judgment is therefore DENIED as to Plaintiff's primary

14    theory of forward confusion.  As discussed in the context of the strength of the marks, however,

15    Defendants' Motion for Summary Judgment is GRANTED as to the theory of reverse confusion.[23]

16    Trial of Plaintiff's trademark claims will be limited to forward confusion.

17    **V.     CONCLUSION**

18             For the reasons discussed above, Defendants' motion to dismiss Plaintiff's false

19    advertising claims is GRANTED, with leave to amend.  If Plaintiff amends or supplements its

20    Complaint to pursue those claims, the parties shall meet and confer regarding potential bifurcation

21    as discussed above.

22             Defendants' motion for summary judgment on Plaintiff's trademark claims is GRANTED

23    only as to the theory of reverse confusion, and is otherwise DENIED.

24

25    ---

26    [23] The Court does not credit Plaintiff's perfunctory arguments under Rule 56(d) of the Federal
      Rules of Civil Procedure that the motion is premature in light of outstanding discovery disputes.
      *See* ECF No. 78 at 6 (mentioning Rule 56(d) in an introduction section); *id.* at 13 (discussing
27    outstanding discovery disputes without citing Rule 56(d) or requesting any relief thereunder).  At
      the hearing, Plaintiff's counsel made clear that Plaintiff is not pursuing further written discovery,
28    and Plaintiff previously agreed to reserve certain depositions until after the resolution of the
      present motions.  *See* ECF Nos. 83, 84.

United States District Court
Northern District of California

1   It is not clear from the docket whether the parties are continuing to engage with a court-

2 appointed mediator.  *See* ECF No. 49.  Notwithstanding paragraph 12 of the Standing Order for

3 All Judges of the Northern District of California,[24] the parties' October 28, 2025 case management

4 statement did not address alternative dispute resolution or prospects for settlement.  *See* ECF No.

5 85.  The parties are directed to file a joint statement no later than February 10, 2026 addressing the

6 status of alternative dispute resolution (without disclosing settlement communications).  The Court

7 will consider referring the case to a magistrate judge for a settlement conference before trial if the

8 parties believe that would be useful.

9   **IT IS SO ORDERED.**

10 Dated: February 3, 2026

                           _____
LISA J. CISNEROS
United States Magistrate Judge

United States District Court
Northern District of California

---

[24] https://cand.uscourts.gov/sites/default/files/standing-orders/Standing_Order_All_Judges-11-30-2023.pdf [https://perma.cc/CW6Z-HQES].